IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMON CAUSE, on its own behalf and
on behalf of its members
1133 19th St. NW, Ste. 900
Washington, DC  20036

Representative JOHN LEWIS,
individually and in his official capacity
as a member of the United States House of
Representatives
343 Cannon House Office Bldg.
Washington, DC 20515

Representative MICHAEL MICHAUD,
individually and in his official capacity
as a member of the United States House of
Representatives
1724 Longworth House Office Bldg.
Washington, DC  20515

Representative HENRY ("HANK") JOHNSON,
individually and in his official capacity
as a member of the United States House of
Representatives
1427 Longworth Building
Washington, DC  20515

Representative KEITH ELLISON,
individually and in his official capacity
as a member of the United States House of
Representatives
1027 Longworth House Office Building
Washington, D.C.  20515

ERIKA ANDIOLA
43 N. Matlock Street
Mesa, Arizona  85203

Civil Action No. _____

CELSO MIRELES
2640 W. Missouri Avenue
Phoenix, Arizona 85017

CAESAR VARGAS
1178 Arthur Kill Road
Staten Island, New York 10312

      Plaintiffs,

    v.

JOSEPH R. BIDEN, in his official capacity
as President of the United States Senate
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20501

NANCY ERICKSON, in her official
capacity as Secretary of the United States Senate
Office of Senate Legal Counsel
United States Senate
642 Hart Senate Office Building
Washington, DC 20510-7250

ELIZABETH MACDONOUGH, in her official
capacity in Parliamentarian of the United States Senate
Office of Senate Legal Counsel
United States Senate
642 Hart Senate Office Building
Washington, DC 20510-7250

TERRANCE W. GAINER, in his official
capacity as Sergeant-at-Arms of the United States Senate
Office of Senate Legal Counsel
United States Senate
642 Hart Senate Office Building
Washington, DC 20510-7250

      Defendants.

964611.1

## COMPLAINT FOR A DECLARATORY JUDGMENT

The plaintiffs respectfully allege the following facts in support of their

complaint for the entry of a judgment pursuant to 28 U.S.C. § 2201, declaring

those portions of Rule XXII[1] of the Standing Rules of the United States Senate—

which require 60 votes on motions to proceed with or close debate on bills or

presidential nominations and a two-thirds vote to proceed with or close debate on

proposed amendments to the Senate rules—unconstitutional because they are

inconsistent with the principle of majority rule.   Secondarily, and in the alternative,

plaintiffs seek the entry of a judgment declaring Rule V of the Standing Rules of

the Senate unconstitutional to the extent that it prohibits the Senate from amending

its rules by majority vote.

## Introduction

1.

Nothing is more fundamental to a democratically elected legislative body

than the principle of majority rule.   The principle of majority rule was so basic to

the concept of a democratically elected legislative body that it did not need to be

expressly stated in the Constitution.   *See United States v. Ballin*, 144 U.S. 1, 6

(1892) ("[T]he general rule of all parliamentary bodies is that … the act of a

majority of the quorum is the act of the body.   This has been the rule for all time.").

---

[1]   Rule XXII is sometimes referred to in this Complaint as the "Senate filibuster rule" or the "Senate cloture rule."

Moreover, when the Framers of the Constitution intended to create exceptions to

the principle of majority rule and to require more than the vote of a majority by

one or both houses in Congress (*e.g.,* to override a veto, expel a member or amend

the Constitution), they did so expressly by six specific provisions of the

Constitution. *See* Paragraph 26 below.

2.

Rule XXII of the Standing Rules of the United States Senate is

unconstitutional.  It "reverse[s]" the democratic principle of majority rule which is

a "fundamental principle of free government" on which the Constitution is based.

*The Federalist*, No. 58, at 397 (James Madison) (Cooke ed. 1961).  Rule XXII

replaces majority rule with rule by the minority by requiring the affirmative votes

of 60 senators on a motion for cloture before the Senate is allowed to even *debate*

or vote on (a) bills or resolutions (with certain exceptions)[2] or (b) whether to

confirm presidential nominations over the objections of a single senator (*i.e.,*

without unanimous consent).

3.

The Framers of the Constitution refused to require more than the vote of a

simple majority except in six carefully defined circumstances precisely because

---

[2]     Some specific kinds of legislation, such as budget reconciliation bills and
declarations of war, have been exempted from being filibustered in the Senate by
statutes that set limits on debate.

964611.1

4

"[i]t would be no longer the majority that would rule; the power [to rule] would be transferred to the minority." *The Federalist*, No. 58, at 397.  The Framers believed that the effect of a supermajority voting rule, such as the 60 vote requirement in the Senate filibuster rule, would "subject the sense of the greater number to that of the lesser number" and that "[i]n its real operation," a supermajority voting requirement would be used by the minority party "to embarrass the administration [and] ... destroy the energy of government." *The Federalist*, No. 22, at 140 (Alexander Hamilton) (Cooke ed. 1961).

4.

Both political parties have used Rule XXII when they were in the minority in the Senate to prevent legislation and appointments proposed by the opposing party from being debated or voted on by the Senate.  For decades, southern Democrats used the filibuster to prevent a bipartisan majority of Democrats and Republicans from enacting anti-lynching, voting rights, and fair employment legislation.  During the presidency of George W. Bush, the Democratic minority in the Senate also used Rule XXII to prevent the confirmation of numerous federal judicial nominees.  After Democrats won a majority of Senate seats in the 2006 elections, the Republican minority in the Senate used the 60 vote requirement in Rule XXII with unprecedented frequency to block Democratic initiatives.  Since the election of President Obama in 2008, the Republican minority in the Senate has

964611.1

5

objected to virtually every significant piece of legislation proposed by the Obama

Administration and more presidential nominations than in any comparable period

in history, all as a part of a strategy to make the Democratic Majority in the Senate

appear to be ineffective, and to make President Obama a one-term president. *See*

Statement of Senate Minority Leader Mitchell McConnell (R. Ky.), "The single

most important thing we want to achieve [in the Senate] is for President Obama to

be a one-term president." Major Garrett, "Top GOP Priority: Make Obama a One-

Term President," *National Journal,* Oct. 21, 2010.

5.

Rule XXII is even more anti-democratic than the one-house veto statute that

was held unconstitutional in *INS v. Chadha*, 462 U.S. 919 (1983), because the 60

vote requirement in Rule XXII gives a dissident *minority* in one house (*i.e.,* the

Senate), a veto power over:

(a)    The Legislative Branch – because no significant bill or resolution can

        pass without first getting 60 votes in the Senate;[3]

---

[3]    The DISCLOSE Act (S. 3628 in the Senate, H.R. 5175 in the House) (111th
Cong. 2nd Sess.) and the DREAM Act (S. 3992 in the Senate, H.R. 5281 in the
House) (111th Cong. 2nd Sess.) are two recent examples. Both bills passed the
House by majority votes, were supported by the President and by a majority of
senators (as evidenced by the fact that both bills received 59 and 55 votes,
respectively, in the Senate on motions for cloture), and would have passed the
Senate and become law but for filibusters made possible by Rule XXII.

(b)     The Executive Branch – because the President cannot fill critical

positions in the Executive Branch that require Senate confirmation

without the support of at least 60 votes in the Senate;[4]

(c)     The Judicial Branch -- because the President cannot fill vacancies in

federal courts – even those that are critical or judicial emergencies –

without the support of at least 60 votes in the Senate.[5]

6.

Rule XXII is also more pernicious than the line-item veto statute that was

held unconstitutional in *Clinton v. City of New York,* 524 U.S. 417 (1998) because

Rule XXII gives a dissident *minority in only one part of one branch*, the power to

nullify laws passed by Congress and signed by the President by:

(a)     Preventing the Senate from debating or voting to confirm the

nomination of the chairs of agencies and bureaus (as occurred when

---

[4]     For example, the minority in the Senate used Rule XXII to prevent confirmation of "[e]xtraordinary nominees like Peter A. Diamond, the Nobel laureate economist who was nominated twice to the Federal Reserve Board and Dr. Donald M. Berwick, a leading authority on evidence-based medicine, nominated to head Medicare and Medicaid, [who] never got an up-or-down vote."  Richard H. Thaler, *The Art of Bargaining, So Lost Upon Washington*, N.Y. Times, Jan. 7, 2012 (http://www.nytimes.com/2012/01/08/business/the-art-of-bargaining-lost).

[5]     More than three years into the Obama presidency, there are currently 82 vacancies in the federal courts, 34 of which are emergency vacancies.  United States Courts, Judicial Vacancies, http://www.uscourts.gov/uscourts/JudgesJudgeships/Vacancies/reports/jdarevac.html.

964611.1

the appointment of Richard Cordray to chair the Consumer Financial

Protection Bureau was filibustered in the Senate),[6] or;

(b)     Preventing the Senate from debating or voting to confirm the

nominations of a quorum of the members of boards and commissions

(as occurred when the Republicans in the Senate filibustered the

nominations of three of the five members of the National Labor

Relations Board).[7]

7.

Rule XXII has primarily been used by the minority, not to protect the right

of the minority to debate the merits of a bill or the fitness of a presidential nominee

on the floor of the Senate (which is the traditional understanding of the term

"filibuster" from *Mr. Smith Goes to Washington*), but to *suppress and prevent the*

---

[6]     For example, in 2011, the Republican minority in the Senate filibustered the
nomination of Richard Cordray to be the chair of the Consumer Financial
Protection Bureau.  According to *The New York Times*, "Senator Mitch McConnell
… the Republican leader, said his party … would not approve a leader for the
watchdog consumer agency until the law … was amended.  Until these changes
[demanded by the minority] are made, he said, 'we won't support a nominee for
this bureau – regardless of who the president is.'"  John H. Cushman, Jr., *Senate
Stops Consumer Nominee*, The N.Y. Times, Dec. 8, 2011
(http://www.nytimes.com/2011/12/09/business/senate-blocks-obama-choice-for-
consumer-panel.html).
[7]     The Republican minority in the Senate also attempted to deprive the
National Labor Relations Board of a quorum by filibustering the nominations of
three appointees to the five-member Board.  Helene Cooper & Jennifer Steinhauer,
*Bucking Senate, Obama Appoints Consumer Chief*, N.Y. Times, Jan. 4, 2012)
(http://www.nytimes.com/2012/01/05/us/politics/richard-cordray-named-
consumer-chief-in-recess-appointment.html).

*majority from debating* the merits of bills or presidential appointments opposed by the minority.

8.

In addition, the rules of the Senate (specifically, Rule V in combination with Rule XXII) prohibit amendments to the rules of the Senate without a two-thirds vote of the senators present and voting, contrary to the provisions of Art. I, Sec. 5, Clause 2 of the Constitution which grants to "[e]ach House" the power to "determine the rules of its proceedings."  The effect of the two rules is to deprive the Senate of the power to amend its own rules by majority vote and to lock-in the filibuster as a means of perpetuating minority rule in the Senate and to make internal reform of the filibuster rule by the Senate impossible as a practical matter.

**Plaintiffs**

9.

**The plaintiffs are:**

**A.     Common Cause individually and on behalf of its members.**

Common Cause is a non-profit corporation organized and existing under the laws of the District of Columbia to serve as a grass roots "citizens lobby" to promote the adoption of campaign finance, disclosure and other election reform legislation by Congress and by state and local governments.

964611.1

**B.**     **Representatives John Lewis, Michael Michaud, Hank Johnson, and Keith Ellison, individually and in their official capacities as Members of the United States House of Representatives.**

(1)     Representative Lewis was first elected to the House of Representatives from Georgia's fifth congressional district in 1986 and has served as a member of the House for over 25 years where he has been described as "the conscience of the U.S. Congress." He has been awarded the presidential Medal of Freedom and the only John F. Kennedy "Profile in Courage Award" for Lifetime Achievement granted by the John F. Kennedy Library Foundation.

(2)     Representative Michaud was first elected to the House of Representatives to represent Maine's second congressional district in 2002. During his service in the House, Representative Michaud has served as a member of a number of committees including the House Committee on Veterans Affairs, where he served as the Chairman of the House Veterans' Subcommittee on Health. Through his leadership on the Committee on Veterans Affairs, Representative Michaud has introduced, co-sponsored, and passed legislation securing medical care for veterans.

(3)     Representative Henry ("Hank") Johnson was first elected to the House of Representatives for Georgia's fourth congressional district in 2006. During his service, he has served as a member of the House Committee on the Judiciary, chaired the Subcommittee on Courts and Competition Policy, and the House

Committees on Armed Services and Transportation and Infrastructure.   Through his leadership in the House, Representative Johnson has introduced, co-sponsored, and passed legislation aimed at improving the lives of working Americans.

(4)     Representative Ellison was first elected to the House of Representatives to represent Minnesota's fifth congressional district in 2006. During his service in the House, Representative Ellison has served as a member of the House Financial Services Committee, the House Judiciary Committee, and the House Committee on Foreign Affairs.

**C.     DREAM Act Plaintiffs Erika Andiola, Celso Mireles, and Caeser Vargas.**

(1)     Each DREAM Act plaintiff is a child of an undocumented immigrant to the United States who was born in a country other than the United States and brought to the United States while a minor child.

(a)     **Erika Andiola** was born in Durango, Mexico and was brought to the United States by her family when she was 11 years old.  She attended Westwood High School in Arizona and graduated as one of the top five students in her high school class.  Ms. Andiola attended Arizona State University on an academic scholarship, and graduated with honors, earning a degree in psychology in 2009.  While attending ASU on scholarship, Ms. Andiola lost her original scholarships as a result of the enactment of Proposition 300, which prohibited undocumented students from receiving publicly-funded scholarships

and required them to pay out-of-state tuition.   Ms. Andiola was able to complete college and earn her degree from Arizona State only because of the generosity of a private donor who helped her pay her college tuition.

Ms. Andiola aspires to become a school counselor and is now serving as a board member, volunteer, and founder of multiple organizations devoted to serving immigrant populations, including United We Dream Network and Promise Arizona.  She also serves as a legal document preparation assistant with the Phoenix Immigration Center, where she assists with the translation of documents and assists individuals with their immigration paperwork.  She is also the co-founder and former chair of the Arizona Dream Act Coalition, an organization devoted to mobilizing Arizona youth to advance DREAM Act legislation and opportunities.  She also co-founded DRM Capitol Group, a national advocacy organization for undocumented youth.

In July 2011, Ms. Andiola was awarded with the Freedom from Fear Award by the Public Interest Projects for her grassroots advocacy for passage of the DREAM Act;

(b)     **Celso Mireles** was born in Mexico and was brought to the United States at age two.  He attended Maryvale High School in Phoenix, Arizona and ultimately graduated from high school in the top 5% of his high

school class.  After graduating from high school, he attended Arizona State University, where he earned a Bachelor of Science in Management with honors.

Mr. Mireles is fluent in both Spanish and English and has advanced technical capability in areas such as HTML and CSS.  Because of his immigration status, his employment opportunities in his chosen field were limited and he was forced to work as a farmer for some time after graduating with honors from Arizona State.  Mr. Mireles now runs a computer repair business.  In November 2011, he won the Stylos Entrepreneur award, given to community members reflecting the accomplishments of Latino Arizona residents.  He is also a founding member of the Arizona Dream Act Coalition and an Online Strategy consultant to United We Dream.

(c)    **Caesar Vargas** was born in Mexico and brought to the United States when he was five years old.  He attended public schools in New York City.  After graduating from James Madison High School, Mr. Vargas earned a bachelor of arts degree in 2005 from St. Francis College in Brooklyn with a 3.6 Grade Point Average ("GPA"), was on the Dean's List, and Vice-President of the Philosophy Club.

After graduating from college, Mr. Vargas earned a J.D. degree from City University of New York School of Law, where he graduated with honors with a 3.8 GPA.  Mr. Vargas was the recipient of numerous awards and scholarships,

964611.1

13

including the Puerto Rican Bar Association Scholarship, El Centro's Advocate Scholarship, and the CUNY Foundation Award.  He has also interned for a New York State Supreme Court Justice and the District Attorney's office in King's County, New York from May 2009 through August 2010, where he assisted with the prosecution of welfare fraud, gun, and homicide cases.

Mr. Vargas is currently the Government Affairs Managing Director at DRM Capitol Group, LLC, which serves as a voice for undocumented youth and is a lobbying arm of the DREAM movement.  Mr. Vargas has appeared with Senator Dick Durbin at a press conference to urge passage of the DREAM Act by the Senate.  During the press conference, Mr. Vargas said, "[W]ithout the DREAM Act, I'm relegated to a mere shadow … I'm asking Congress to give us the opportunity to serve the only country we know, the only country we call home."

**D.     Each of the Plaintiffs Has Standing to Bring This Suit.**

(1)    **Common Cause.**

(a)     Common Cause has both organizational standing and member standing to bring this action (a) on own its own behalf and (b) on behalf of its more than 400,000 members who have been injured by Rule XXII.

(b)     Common Cause devoted major time and resources to support the enactment of the DISCLOSE ACT (H.R. 5175 and S. 3628) during the 111th Congress.  The purpose of the DISCLOSE Act was to mitigate some of the

negative effects of the ruling in *Citizens United v. F.E.C.*, 558 U.S. ___, 130 S. Ct. 876 (2010), by requiring the prompt disclosure of the sources of all expenditures in excess of $10,000 or more by corporations and wealthy individuals in connection with federal elections beginning with the 2010 elections.  The DISCLOSE Act passed the House of Representatives, had the support of 59 senators and the President, but nevertheless died in the Senate when a minority of senators used Rule XXII to prevent the DISCLOSE Act from being debated or voted on in the Senate.

(c)    The use of Rule XXII to prevent the enactment of the DISCLOSE Act during the 111th Congress has caused a direct and immediate injury to Common Cause as an organization:  (i) the time, effort and resources that had been devoted by Common Cause and its members to the passage of the DISCLOSE Act were wasted; and (ii) Common Cause has been forced to divert staff, time and resources that could have been used to support other election reforms to combatting the effects of secret expenditures by Super PACs and others in federal elections that would have been prohibited by the DISCLOSE Act; and (iii) Common Cause has been forced to devote additional time and resources to support the enactment of a new DISCLOSE Act (H.R. 4010, S. 2219) by the 112th Congress, expenditures that would have been unnecessary, but for the successful filibuster of the DISCLOSE Act by the minority during the 111th Congress.

(d)     The use of Rule XXII to prevent the enactment of the

DISCLOSE Act has also caused a direct and concrete injury to the members of

Common Cause.  The members of Common Cause have been deprived during the

2010 elections and will be deprived during the 2012 elections of relevant

information concerning the identities of the corporations and wealthy individuals

who are secretly spending millions to finance negative campaign ads by Super

PACs and other front organizations to support or defeat both candidates in the

presidential and congressional primary and general election campaigns –

information that would have been available to the members of Common Cause but

for the filibuster of the DISCLOSE Act during the 111th Congress.

(e)     Common Cause was also injured when Rule V of the Standing

Rules of the Senate was used to prevent the Senate from debating or voting on

three resolutions (S. Res. 8, S. Res. 10, and S. Res. 21) that were introduced on the

first legislative day of the 112th Congress.  The purpose of the resolutions was to

amend the rules of the Senate to reduce or mitigate the power of the minority to

obstruct the business of the Senate.  The time and resources devoted by Common

Cause in support of a nationwide campaign to build public support for those much-

needed and long-overdue reforms of the Senate rules were wasted when Senator

Lamar Alexander invoked Rule IV (which would not have been in effect but for

the provisions of Rule V that provided that the rules of the Senate continue from

one Congress to the next) to prevent the Senate from considering those resolutions on the same day they were introduced.

> (2) **Representatives Lewis, Michaud, Johnson and Ellison Have Standing Individually and in their Official Capacities.**

(a) Representatives Lewis, Michaud, Johnson and Ellison ("the Representatives") have been injured each time the 60 vote requirement in the Senate filibuster rule has been used by a minority of senators to nullify votes that the Representatives cast as members of the House by Representatives in favor of numerous bills and resolutions that passed the House, had the support of a majority of senators, and would have passed the Senate and become law but for Rule XXII. These bills include the DISCLOSE Act and the DREAM Act, both of which passed the House during the 111th Congress and would have been passed by the Senate and been enacted into law, but for threatened filibusters by a minority of senators under Rule XXII that prevented both bills from being debated on the floor of the Senate despite having the support of a majority of senators.

(b) The Representatives have each sustained a separate injury as candidates for re-election when a minority of senators used the 60 vote requirement in the Senate cloture rule to prevent the DISCLOSE Act from being debated or voted on by the Senate, despite the fact that it had the support of 59 senators.  The DISCLOSE Act would have required the prompt disclosure of the identities of corporations and wealthy individuals—who have been secretly

964611.1

financing negative campaign ads by Super PACs and other phony grass roots
organizations in the Representatives' campaigns for re-election to the House—
which would have enabled the Representatives and their supporters to evaluate and
respond more effectively to those attacks.

(c)    Representative Michaud has been uniquely injured by a Senator
from South Carolina's "hold"[8] of a veterans' health care bill that passed the House
of Representatives, but is being held up in the Senate despite majority support for
the bill.  Such a hold may have had fatal consequences.  At least one veteran, who
was waiting for admission to a veterans' care facility, died while the bill was
pending.  That bill, which would have passed the Senate and been enacted but for
the hold, would have ensured that the veteran received the care he so desperately
needed and deserved.

E.    **DREAM Act Plaintiffs.**

(1)    Each DREAM Act plaintiff has been denied a path to United
States citizenship, and is now subject to the risk of deportation as a direct result of
the 60 vote requirement in Rule XXII.  A minority of the Senate used Rule XXII to

---

[8] A "hold" is a threat by an individual senator to object when a request for
unanimous consent is made to proceed with consideration (*i.e.*, debate) of a bill or
presidential nomination.  The effect of a "hold" is to give the majority leader, and
the proponents, advance notice that the bill or nomination is not likely to reach the
floor of the Senate without the adoption of a motion to proceed.  A motion to
proceed is a debatable motion that cannot be brought to a vote without unanimous
consent of the adoption of a motion for cloture which requires 60 votes.

964611 1

18

prevent the DREAM Act from reaching the floor of the Senate where it could be fully debated and voted on its merits, despite the fact that the DREAM Act had the support of a clear majority of 55 senators and the support of the President.

## Defendants

10.

The defendants are:

**A.**     **Joseph R. Biden,** in his official capacity as President of the United States Senate, whose official duties include presiding over the Senate and ruling on points of order, including points of order that challenge the constitutionality of the standing Rules of the Senate.

**B.**     **Nancy Erickson,** in her official capacity as Secretary of the United States Senate, whose official duties include recording the votes and keeping the official minutes and records of the Senate.

**C.**     **Elizabeth MacDonough**, in her official capacity as the Parliamentarian of the United States Senate, whose official duties include advising the Vice President in his capacity as President of the Senate (or other presiding officers of the Senate) on issues of parliamentary procedure and points of order.

**D.**     **Terrence W. Gainer**, in his official capacity as Sergeant-at-Arms of the United States Senate, whose official duties include the enforcement of all rules of the Senate, including Rule V and Rule XXII.

964611.1

## Jurisdiction

### 11.

This Court has original jurisdiction of this civil action under 28 U.S.C. §1331, because the plaintiffs' claims arise under the Constitution of the United States.

### 12.

This Court has jurisdiction to enter a declaratory judgment under 28 U.S.C. § 2201 declaring that Rules V and XXII of the Rules of the Senate are in conflict with the Constitution and are, therefore, null and void.

## Venue

### 13.

Venue in this district is proper under 28 U.S.C. § 1391(b).

## The Rules of the Senate at Issue

### 14.

Under the Standing Rules of the Senate, motions to begin debate on a bill or resolution (with certain exceptions) or a presidential nomination, and motions to end debate and proceed to an up-or-down vote, are debatable motions and cannot be adopted without unanimous consent, or a motion for cloture under Rule XXII which requires 60 votes.

### 15.

964611.1

The rules of the Senate prohibit a bill (or nomination) from being brought to the floor of the Senate and debated or for debate on a matter to be terminated and brought to a vote without (a) unanimous consent, or (b) a motion to proceed which is a debatable motion.  A "hold" or any objection from a single senator as a request for unanimous consent (*i.e.,* a threatened filibuster) is sufficient to prevent the Senate from debating, or from proceeding to a final vote without the adoption of a motion for cloture under Rule XXII, which is the time-consuming and cumbersome procedure that requires 60 votes – or 67 votes if the matter involves a proposed amendment to the Senate rules – and 30 additional hours of debate even after a motion for cloture has been adopted.

16.

Rule XXII of the rules of the Senate provides in pertinent part as follows:

> 22.2   Notwithstanding the provisions of rule II or rule IV or any other rule of the Senate, at any time a motion signed by sixteen Senators, to bring to a close the debate upon any measure … is presented to the Senate, the Presiding Officer, or clerk at the direction of the Presiding Officer, shall at once state the motion to the Senate, … he shall lay the motion before the Senate and direct that the clerk call the roll, and upon the ascertainment that a quorum is present, the Presiding Officer shall, without debate, submit to the Senate by a yea-and-nay vote the question:
>
> "Is it the sense of the Senate that the debate shall be brought to a close?"  *And if that question shall be decided in the affirmative by three-fifths of the Senators duly chosen and sworn – except on a measure or motion to amend the Senate rules, in which case the necessary affirmative vote shall be*

> *two-thirds of the Senators present and voting* – then said
> measure ... shall be the unfinished business to the exclusion of
> all other business until disposed of.

Senate Manual, pp. 20-21 (2011 ed.) (emphasis added).

17.

Rule XXII also provides that even after cloture has been invoked, the Senate

cannot "proceed ... to vote on final disposition" on a motion to begin or end

debate, until "[a]fter no more than thirty hours of consideration of the measure ...

on which cloture has been invoked." *Id.* at 21.

18.

Actual or threatened filibusters (or objections to the commencement of

debate which are the functional equivalent of a filibuster) have become so common

that it is now virtually impossible as a practical matter for the majority in the

Senate to pass a significant piece of legislation or to confirm many presidential

nominees without the 60 votes required to invoke cloture under Rule XXII. *See,*

*e.g.,* Oral Argument Transcript of *Nat'l Fed. of Ind. Bus. v. Sebelius,* No. 11-393,

p. 72, Mar. 28, 2012 (Justice Scalia: "You can't repeal the rest of the Act because

you're not going to get 60 votes in the Senate ... You've got to get 60 votes.").

19.

Moreover, the combination of Rule V and Rule XXII has made it virtually

impossible for the majority in the Senate to amend the rules of the Senate to

964611.1

prevent the minority in the Senate from obstructing the business of the Senate by filibustering:

> 2.     The rules of the Senate *shall continue from one Congress to the next Congress unless they are changed as provided in [its] rules [i.e., by a two-thirds vote under Rule XXII].*

Senate Manual, p.5 (2011 ed.) (emphasis added).

### Origin of the Filibuster

20.

At the time the Constitution was adopted, there was no recognized "right" on the part of members of legislative or other parliamentary bodies to obstruct the functioning of those bodies by engaging in unlimited debate over the objections of the majority (*i.e.*, "filibustering").

21.

Under the established rules of parliamentary procedure that prevailed both in England and in the Continental Congress prior to the adoption of the Constitution, the majority had the power to end a debate and bring a measure to an immediate vote at any time over the objection of the minority by adopting a motion for the previous question.

22.

The previous question motion was adopted as a part of the rules of the English Parliament in 1604, and allowed the majority in Parliament to end debate

964611.1

and bring a measure to an immediate vote at any time by a vote of a simple majority, thereby making it impossible for the minority to filibuster the proceedings of Parliament.

23.

Filibusters were also not permitted under the Rules of the Second Continental Congress (adopted on May 10, 1778). Under Rule 13, a majority of the Continental Congress had the power to close debate and bring a measure to an immediate vote at any time over the objections of a minority by the adoption of a motion for the previous question:

> Rule 10.  While a question is before the House, no motion shall be received, unless for an amendment, *for the previous question*, to postpone the consideration of the main question, or to commit it.
>
> * * * *
>
> Rule 13.  The previous question (that is, that the main question be not put) being moved, the question from the chair shall be, that those who are for the previous question say ay, and those against it, no; and if there be a majority of ayes, then the question shall not be put, but otherwise it shall.

*XI Journals of the Continental Congress*, 1774-1789, at 534-35 (1908).

24.

The Articles of Confederation were an exception to the general rule of all parliamentary bodies that prevailed prior to the adoption of the Constitution that "[t]he act of a majority of a quorum [was] the act of the body." *United States v. Ballin*, 144 U.S. 1, 6 (1892). Under the Articles of Confederation, voting was by

964611.1

state and the "United States in Congress" was unable to take action without a supermajority vote of nine of the thirteen states.  The requirement made the government under the Articles weak and ineffective and was one of the major factors that led directly to the Constitutional Convention.

## The Constitutional Convention

25.

The Framers of the Constitution had observed first-hand the paralysis caused by the supermajority voting requirement in the Articles of Confederation and refused to require more than a majority, either as a condition of a quorum or for the passage of legislation under the proposed new constitution.  The Framers instead specified in the Quorum Clause (Art. I, § 5) that only "a Majority of each House shall constitute a Quorum to do Business," and specified in the Presentments Clause that only the vote of a simple majority of a quorum of each house of Congress would be required for passage of a bill (Art. I, § 7, cl. 2) or a resolution (Art. I, § 7, cl. 3) prior to it being sent to the other house or presented to the President.

26.

The Framers also decided that certain actions were of such an unusual nature or of such gravity and importance that they should not be decided by a vote of a

simple majority of the House or Senate.  Six exceptions to the principle of majority rule were expressly enumerated and defined in the Constitution:

1.  Art. 1, § 3, cl. 6 – Impeachments:

     "And no Person shall be convicted *without the Concurrence of two thirds of the Members present*."

2.  Art. 1, § 5, cl. 2 – Expelling Members:

     "Each House may … punish its Members for disorderly Behavior, and, with the Concurrence of *two-thirds, expel a Member*."

3.  Art. 1, § 7, cl. 2 – Overriding a presidential veto of a bill:

     "If after such Reconsideration *two-thirds of that House shall agree to pass the Bill*, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and *if approved by two thirds of that House*, shall become a Law."

4.  Art. 1, § 7, cl. 3 – Overriding a presidential veto of "[an] Order, Resolution or Vote to which the Concurrence of the Senate and House … may be necessary:"

     "… or being disapproved by him, shall be *repassed by two thirds of the Senate and House of Representatives*, according to the Rules and Limitations prescribed in the Case of a Bill."

5.  Art. 2, § 2, cl. 2 – Ratification of treaties by the Senate:

     "He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, *provided two thirds of the senators present concur*."

6.  Art. V – Amendments to the Constitution:

     "The Congress, *whenever two thirds of both Houses shall deem it necessary*, shall propose Amendments to this Constitution."

27.

In addition to the six exceptions to the principle of majority rule specified in the original Constitution, two additional exceptions were subsequently added by amendment:

(a)     Amendment XIV, Sec. 3 – "Congress may by a *vote of two-thirds of each House*, remove [the] disability" to hold public office of any person who engaged in insurrection or rebellion against the United States.

(b)     Amendment XXV, Sec. 4 – "Congress … [may] determine[ ] *by two-thirds vote of both Houses* that the President is unable to discharge the power and duties of his office…."

### *The Federalist*

28.

James Madison and Alexander Hamilton had been both delegates to the Federal Convention and signers of the proposed new Constitution. Madison and Hamilton, along with John Jay, became the leading advocates of the ratification of the new Constitution in *The Federalist*.

29.

Opponents of ratification argued that the proposed new Constitution failed to adequately protect the rights of minorities by allowing a bare majority to constitute a quorum to pass legislation rather than requiring a supermajority. Madison and Hamilton responded to these attacks in three editions of *The Federalist, Nos. 22, 58 and 75*, in which they both defended the Constitutional Convention's adherence

to the principle of majority rule and its rejection of a supermajority requirement either for purposes of a quorum, or as a condition of passage of legislation.

30.

James Madison argued in *The Federalist No. 58*, for example, that the inclusion of a supermajority voting requirement in the Constitution would have been a "revers[al]" of the "fundamental principle of free government" and would have meant that "no longer [would] the majority ... rule; the power would be transferred to the minority." *The Federalist No. 58*, at 397 (Cooke ed. 1961).

31.

In the same issue of *The Federalist*, Madison explained that if the vote of a supermajority in Congress were required for the passage of legislation "an interested minority might take advantage of it to screen themselves from equitable sacrifices ... [or] to extort unreasonable indulgences" from the majority as the price of their support. *The Federalist No. 58*, at 597 (Cooke ed. 1961).[9]

---

[9]     A few examples from recent history show that Madison's concerns were more than justified.  For example, Senator Ben Nelson of Nebraska and Senator Mary Landrieu of Louisiana extracted the "Cornhusker Kickback" and the "Louisiana Purchase," as conditions of their votes for cloture on the Health Care Reform Bill.  Dana Milbank, *On Health-care Bill, Democratic Senators are in States of Denial*, *Wash. Post*, Dec. 22, 2009 (http://www.washingtonpost.com/wp-dyn/content/article/2009/12/21/AR2009122102861.html).  Senator Richard Shelby of Alabama put holds on and threatened to filibuster 70 presidential nominations to secure a defense contract for a company in Alabama.  Scott Wilson & Shailagh Murray, *Sen. Richard Shelby of Alabama Holding Up Obama Nominees for Home-*

32.

Alexander Hamilton also defended the decision of the Constitutional

Convention to follow the principle of majority rule and reject supermajority voting

in *The Federalist Nos. 22* and *75.*  In *No. 22,* Hamilton explained that

supermajority voting requirement in Congress would have meant that "the

majority, in order that something may be done, must conform to the views of the

minority; and thus … the smaller number will overrule that of the greater."  He

also warned that "[in] its real operation," a supermajority voting requirement

would be used by a minority in Congress to "embarrass the administration,…

destroy the energy of government," and would substitute "the pleasure, caprice or

artifices of an insignificant, turbulent, or corrupt junta … [for] the deliberations

and decisions of a respectable majority."  *The Federalist No. 22*, at 140 (Cooke ed.

1961).

33.

In *The Federalist No. 75*, Hamilton again stressed that a supermajority

voting requirement in Congress would have "a direct tendency to embarrass the

operations of the government, and an indirect one to subject the sense of the

majority to that of the minority."  *The Federalist No. 75*, at 507-08.

---

*State Pork*, Wash. Post, Feb. 6, 2010 (http://www.washingtonpost.com/wp-dyn/content/article/2010/02/05/AR2010020502098.html).

34.

Hamilton also warned that a supermajority vote requirement would make it more difficult for Congress to enact good legislation[10] and to repeal bad legislation.[11] "[W]e [should not] forget how much good may be prevented, and how much ill may be produced" if a minority in either house of Congress had "the power of hindering the doing what may be necessary and of keeping affairs in [the status quo]." *The Federalist No. 22*, at 141 (Cooke ed. 1961).

### The First Rules of the Senate

35.

Many of the members of both the Senate and the House of the first Congress that convened in 1789, immediately after the ratification of the Constitution, had been delegates to the Federal Convention.

36.

The first rules adopted by both the Senate and by the House of Representatives immediately after ratification of the Constitution, pursuant to the

·

---

[10]    The history of the Senate is filled with examples of the filibuster having been used to perpetuate the status quo and kill much-needed reforms.  For decades the filibuster was used to prevent Congress from enacting anti-lynching legislation, equal employment legislation, fair housing and public accommodations legislation and other civil rights legislation.

[11]    *See, e.g.*, Remarks of Justice Scalia in *Nat'l Fed. of Ind. Bus. v. Sebelius*, No. 11-393, p. 72, Mar. 28, 2012 (Justice Scalia:  "You can't repeal the rest of the Act because you're not going to get 60 votes in the Senate … You've got to get 60 votes.").

964611.1

rule-making power granted to each house by Art. 1, Sec. 5, Cl. 2 of the

Constitution, were adopted by vote of a simple majority of each house.

37.

Under the first rules adopted by the Senate in 1789, Senators had no right of

unlimited debate or to obstruct the business of the Senate by filibustering.  Instead,

the first Senate adopted the previous question motion from English parliamentary

practice as part of its rules.  Rules VIII and IX of the first rules of the Senate

provided:

> VIII.  When a question is before the Senate, no motion shall be received unless for an amendment, *for the previous question*, or for postponing the main question, or to commit it, or to adjourn.

> IX.  The *previous question being moved and seconded, the question from the chair shall be, 'Shall the main question now be put*?'  And if the nays prevail, the main question shall not then be put.

Annals of Congress, First Congress, First Session, p. 21-22 (April 16, 1789)

(emphasis added); *see Jefferson's Manual*, Sec. XXIV – The Previous Question

(1797) (reprinted in H. Doc. No. 99-279, at p. 221 (99th Cong. 2nd Sess. 1987)).

### The Elimination of the Previous Question Motion from the Senate Rules

38.

The previous question motion was eliminated from the rules of the Senate in

1806, apparently at the urging of Vice President Aaron Burr who, in his farewell

address before the Senate in 1805, said that the Senate rules were too complex and

needed simplification.  Burr suggested the elimination of the previous question

motion, which Burr thought was unnecessary because it had been invoked only

once during the four years that he had presided over the Senate (1801-1805).  John

Quincy Adams, Vol. 1, *Memoirs of John Quincy Adams* 365 (Charles Francis

Adams, ed. 1874) (quoted in Sarah A. Binder and Steven S. Smith, *Politics or*

*Principle: Filibustering in the United States Senate*, p. 38 (1997)); *see also,*

Journal of the Senate, pp. 65-68 (1806).

39.

Although the previous question motion was eliminated from the rules of the

Senate in 1806, its elimination had no immediate effect on the business of the

Senate.  The first filibuster did not occur for another thirty-five years (1841) –

more than a half century after the adoption of the Constitution when a small group

of senators took advantage of the absence of a rule limiting debate to prevent votes

on bills to remove the government printers and to create a Bank of the United

States.

**The Origin of the Senate Filibuster Rule**

40.

From 1806 until 1917, the Senate had no rule that allowed the majority to

limit debate or terminate a filibuster.  Despite the absence of a rule for limiting

debate, filibusters were relatively rare during this period and occurred at an average rate of one every three years between 1840 and 1917.

41.

In March of 1917, on the eve of America's entry into WWI, a small minority of isolationist senators filibustered a bill to amend the Neutrality Act to allow the arming of American merchant ships to protect them from attack by German submarines.

42.

The public was outraged by the filibuster, and President Woodrow Wilson condemned the Senate as

> ... the only legislative body in the world which cannot act when its majority is ready for action. A little group of willful men, representing no opinion but their own, have rendered the great government of the United States helpless and contemptible.

43.

As a result of pressure from the President and the public, the Senate adopted the predecessor of the current Senate filibuster rule (Rule XXII) to provide – for the first time in over 100 years – a procedure for limiting debate and ending filibusters.

44.

The purpose of the 1917 version of Rule XXII was not to *guarantee* a

minority of senators the right to obstruct the proceedings in the Senate by

filibustering, but to provide a procedure for ending filibusters where none had

existed for 111 years.

45.

The 1917 filibuster rule required a two-thirds vote of the Senate to end

debate and had other major loopholes that made the rule largely ineffective as a

means of ending filibusters in the Senate.  Despite the limitations in Rule XXII,

filibusters were relatively rare prior to 1970, and were primarily used by southern

senators to block anti-lynching, fair employment, voting rights and other civil

rights bills.

46.

There were only 26 filibusters (an average of less than 1 per year) in the first

30 years after the adoption of the cloture rule in 1917 (1918-1949), and a total of

27 filibusters (an average of 1.4 per year) during the next 20 years (from 1950-

1969).

## The Flood in the Number of Filibusters

47.

The number of actual or threatened filibusters has increased dramatically since 1970, and now dominate the business of the Senate. The following chart illustrates the dramatic increase in the number of filibusters as measured by the number of formal cloture motions.[12]



---

[12]     The number of formal cloture motions drastically understates the actual impact of Rule XXII on the legislative process. "A credible threat that forty-one Senators will refuse to vote for cloture … is enough to keep a bill off the floor. The Senate leadership simply delays consideration of a bill until it has the sixty votes necessary for cloture…. [T]he stealth filibuster eliminates the distinction between a filibuster and a threat to filibuster; any credible threat to filibuster is a filibuster … and is largely silent [and] invisible." Catherine Fisk & Erwin Chemerinsky, *The Filibuster*, 49 Stan. L. Rev. 181, 203 (1997).

Source: 66th -- 110th Congress – Senate Action on Cloture Motions,
http://www.senate.gov/pagelayout/reference/cloture_motions/clotureCounts.htm.

48.

Since the election of President Obama in 2008, Rule XXII has been used by

the minority party in the Senate to "embarrass the administration [and] destroy the

energy of government" (*The Federalist* Nos. 22 and 75) withholding unanimous

consent and threatening to filibuster virtually every piece of major legislation

proposed by the administration.  As Senate Minority Leader, Mitchell McConnell

(R. Ky.) told the *National Journal,* "the single most important thing we want to

achieve is for President Obama to be a one-term president."  Major Garrett, *Top*

*GOP Priority:  Make Obama a One-Term President, National Journal*, Oct. 21,

2010.

49.

The filibuster has been used with increasing frequency by the minority party

in the Senate to prevent the President from filling critical vacancies in both the

executive and the judiciary branch agencies.

50.

There were a record 67 filibusters in the first half of the 111th Congress

(2009) – *double the number of filibusters that occurred in the entire 20-year period*

*between 1950 and 1969.*  By April 2010, the number of filibusters had grown to a

record 92, surpassing the entire number of cloture motions filed in the 109th

964611.1

Congress (2005-2006), and triple the number of filibusters in the entire 20-year period between 1950 and 1969. By the time the 111th Congress adjourned in December 2010, the number of filibusters had swelled to 137 for the entire two-year term of the 111th Congress.

51.

Threats by the minority party in the Senate to filibuster have now become so common and pervasive in the Senate that no significant bill or resolution can be debated on the floor of the Senate, much less passed by the Senate, and no presidential judicial nominee or nominee to a significant executive branch agency can receive a confirmation vote in the Senate without the support of at least 60 senators.

52.

During the 111th Congress that ended in December 2010, over 400 bills that had been passed by the House of Representatives -- many with broad bipartisan support -- died in the Senate without ever having been debated or voted on in the Senate because of the inability to obtain the 60 votes required by Rule XXII to overcome objections (or threatened filibusters) by a small minority of senators.

53.

Since the election of President Obama in 2008, the minority party in the Senate used Rule XXII to prevent debate and prevent the Senate from voting

whether to confirm well over 100 nominations by the President to fill critical vacancies in the Executive and Judicial Branches.

## The Senate Is Incapable of Restoring Majority Rule

54.

Beginning with Henry Clay in 1841, leading members of the Senate have attempted to persuade the Senate to amend its rules to allow the majority to end filibusters.  Although well over 100 attempts have been made over the past 160 years to restore the principle of majority rule in the Senate, all efforts at reform have been defeated by the inability of the reformers to obtain the necessary two-thirds votes required by Rule XXII to amend the filibuster rule.  *Senate Cloture Rule, Limitation of Debate in the Senate of the United States and Legislative History of Paragraph 2 of Rule XXII of the Standing Rules of the United States Senate (Cloture Rule)* S. Rpt. 112-31 (112th Cong. 1st Sess.).  Congressional Research Service, pp. 11-42, Dec. 5, 2011.

55.

The combination of Rules V, VIII and Rule XXII has made it impossible for the majority of the Senate to restore the principle of majority rule in the Senate by amending, suspending or repealing the supermajority vote requirement in Rule XXII because:

(a)     under Rule V, the rules of the Senate do not expire at the end of each term of Congress, as do the rules of the House, but are declared to be

964611.1

38

continuing from one Congress to the next.  Rule V further declares that the rules cannot be amended except as provided by Rule XXII, which requires a two-thirds vote to invoke cloture on a motion to amend the rules;

(b)     under Rule VIII, a motion to proceed with consideration of a resolution to amend Rule XXII, or any other Senate rule, requires unanimous consent without which a motion to proceed with debate is itself a debatable motion, and is, therefore, itself subject to being filibustered by a minority of senators; and

(c)     assuming that the Senate has been allowed to debate on a resolution to amend Rule XXII, debate cannot be terminated over the objection of a single senator without the adoption of a motion for cloture of debate, which, in the case of amendments to the Senate rules, requires an affirmative vote of two-thirds of the senators present and voting, rather than the 60 votes required for cloture of debate on other matters.

## Count One

56.

The plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 55 above and of paragraphs 76 through 78 below as allegations of Count One.

57.

The rule-making power delegated to each House by Art. I, § 5, cl. 2 of the Constitution to "determine the rules of its proceedings" is not unlimited.  While the Senate is authorized to adopt rules of parliamentary procedure, the Senate does not have the power under Article I, § 5 to adopt rules that conflict with other provisions in the Constitution.  *United States v. Ballin*, 144 U.S. 1, 6 (1892).

964611.1

58.

The Senate is not authorized by Art. I, § 5, cl. 2 to adopt a substantive rule that gives a minority of senators the power to dictate electoral outcomes or veto bills in the Senate or presidential appointments, contrary to the will of the majority.

59.

The Senate filibuster rule (Rule XXII) exceeds the rule-making power of the Senate under Art. I, § 5, cl. 2 and is unconstitutional because:

(a)     the rule conflicts with the fundamental principle of majority rule embedded in the Constitution and on which the Constitution was founded;

(b)     the rule also upsets the carefully crafted checks and balances between the three branches of government by giving a dissident *minority in only one house of one branch* (the legislative branch) the power to create gridlock, cripple and impede the effective functioning of not only the legislative branch, but also the executive and judicial branches of government by preventing the President from filling hundreds of vacancies in both the executive and the judicial branches;

(c)     the rule allows a minority of senators to prevent the majority from performing their constitutional obligations as senators under the

964611.1

Advice and Consent clause in Art. II, § 2, cl. 2 to debate and vote on presidential nominations;

(d)   the rule gives a minority of senators a veto power over the business of the Senate and to create gridlock in Congress by preventing the majority in the Senate from debating or voting on bills, resolutions or presidential nominations, thereby dictating negative outcomes;

(e)   the rule gives the minority in the Senate the power to nullify the votes cast by members of the House of Representatives in favor of bills that passed the House that have the support of a majority of senators, and would have been passed in the Senate and become law but for filibusters; and

(f)   the rule, in combination with Rule V, deprives the majority in the Senate of the power granted by Art. I, § 5, cl. 2 to amend the rule of the Senate by majority vote.

60.

The 60 vote requirement in Rule XXII is invalid because it is in conflict with the following provisions of the Constitution:

(a)   *The Quorum Clause*.  The Quorum Clause in Article I, § 5 of the Constitution provides that only the presence of a simple majority of senators is necessary to "do Business" in the Senate.  Rule XXII conflicts with the Quorum

964611 1

41

Clause because under Rule XXII, the Senate cannot "do Business" as a practical matter without the *presence* of at least 60 senators to vote in favor of a motion for cloture.  Without 60 votes, the Senate can neither debate nor vote on most bills and resolutions, or debate or vote on any presidential nominations in the face of an objection from a single senator.

(b)     *The Presentment Clause.*   The Presentment Clause in Art. I, § 7 provides that only the vote of a simple majority of a quorum is required to "pass" a bill or a resolution prior to its being sent to the House of Representatives or presented to the President.  *United States v. Ballin*, 144 U.S. 1, 6 (1892) ("[W]hen a quorum is present, the act of a majority of the quorum is the act of the body.").  Rule XXII conflicts with the Presentment Clause by requiring that (1) at least 60 senators vote in favor of a motion for cloture before a bill or resolution may reach the floor of the Senate for debate and (2) a second vote of at least 60 senators before debate on a bill or resolution that has reached the floor of the Senate can be ended and the measure brought to a final up-or-down majority vote.

(c)     *The Exclusive List of Exceptions.*   The Constitution contains an exclusive list of eight exceptions to the principle of majority rule in which action is conditioned on the vote of more than a simple majority.  These exceptions define the only circumstances under which the vote of a simple majority is not sufficient, and action is conditioned on a supermajority vote of the House or Senate.  Rule

XXII conflicts with these exceptions by adding to the circumstances in which the majority of a quorum in the Senate does not have the power to act.

(d)     *The Power of the Vice President to Vote in the Senate to Break a Tie*. Art. I, § 3, cl. 4 authorizes the Vice President to vote in case of a tie vote in the Senate.  Rule XXII conflicts with this provision because the practical effect of Rule XXII is to deprive the Vice President of the power to cast a deciding vote in the Senate when "they be equally divided," which is one of only two powers granted to the Vice President by the Constitution.

(e)     *The Advice and Consent Clause*.  The Advice and Consent Clause in Article II, § 2, cl. 2 grants to each senator the right to vote to approve or disapprove individuals who have been nominated by the President to ambassadorships, to the judiciary and to fill positions in the executive branch that require confirmation by the Senate.  Rule XXII conflicts with the Advice and Consent Clause by allowing a minority in the Senate to deprive the other senators of their right to vote for or against the confirmation of presidential nominees and to defeat a presidential nominee without a confirmation vote.

(f)     *The Equal Representation of States in the Senate*.  The effect of Art. I, Sec. 3 and Art. V was to provide for equal representation of each state in the Senate and to give senators elected from a majority of the states the power to pass legislation and confirm presidential appointments.  Rule XXII conflicts with these

provisions by allowing a minority of senators elected from as few as 21 states to

prevent the majority of senators representing a majority of states from passing

legislation or confirming presidential nominees.

## Count Two

61.

The plaintiffs hereby incorporate by reference the allegations of paragraphs

1 through 55 above and of paragraphs 76 through 78 below as allegations of Count

Two.

62.

Rule XXII upsets the "finely wrought and exhaustively considered" balance

of the Great Compromise (*INS v. Chadha*, 462 U.S. 919, 951 (1983)) between the

interests of the majority of citizens residing in the more populous states and those

of the minority living in the less populous states and is, therefore, unconstitutional.

63.

The Great Compromise was a political bargain between delegates

representing the larger states and delegates representing the smaller (or less

populous) states without which the Constitution would not have been approved at

the Federal Convention nor ratified by the required number of state conventions.

964611.1

64.

The larger states acceded to the demand by the smaller states for equal

representation in the Senate (*i.e.*, providing in Article I, § 3 and Article V for equal

representation of each state in the Senate by two senators elected by their

respective legislatures without regard to population)[13] in return for the agreement

of the smaller states to apportionment of representation in the House of

Representatives between and among the states based on their respective

populations. *See* Art. I, § 2.

65.

Even though seats in the Senate were not apportioned among the states

based on population, the Great Compromise still preserved a degree of majority

rule by giving a majority of states, acting through their senators, the power to both

pass legislation in the Senate and to confirm presidential nominees. Rule XXII

takes that power away from the majority of states by increasing from 26 to 30 the

minimum number of states from which at least one senator must vote to obtain

cloture under Rule XXII as a condition of passage of legislation or the

confirmation of a presidential nomination.

---

[13]     Art. I, § 3's guarantee of equal representation of the states in the Senate is
protected from repeal or amendment by Article V, which provides "that no state,
without its consent, shall be deprived of its equal suffrage in the Senate."

66.

Rule XXII also upsets the balance wrought by the Great Compromise between the interests of a majority of the population residing in the larger states and those of the minority residing in the less populous states.

67.

Rule XXII has also made representation of the people in the Senate even less democratic and less representative than under the Great Compromise.  At the time the Constitution was adopted, 28% of the population in the seven least populous states could elect a majority of the 26 members of the Senate.  Since that time, the Senate has become less and less representative as a result of the admission of new states, the migration of the population from rural states to urban states and the concentration of the population in cities.  By 2010, only 18% of the population living in 26 states has the power to elect a majority of the 100 member Senate.

68.

Rule XXII has significantly increased the under-representation in the Senate of people living in the more populous states well beyond that dictated by the Great Compromise.  Rule XXII gives senators elected from 21 states that may contain as little as 11% of the U.S. population an absolute veto power over bills, resolutions and presidential appointments supported by senators who represent 83% of the people of the United States.

964611 1

46

69.

Rule XXII effectively deprives states of their right to an equal voice in the Senate in violation of Article I, Section 3 and Article V by depriving the senators representing a majority of the states of their decision-making authority and increasing from 26 to 30 the number of states whose senators must vote to pass a bill or resolution in the Senate.

70.

Rule XXII also redistributes political power among the states by reducing from 26 to 21 the number of states whose senators have the power to veto legislation and presidential appointments even when those bills or appointments are supported by senators elected from a majority of states.

**Count Three**

71.

The plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 55 above and of paragraphs 76 through 78 below as allegations of Count Three.

72.

Rule V of the Rules of the United States Senate provides:

> 2.      The rules of the Senate shall continue from one Congress to the next Congress unless they are changed as provided in these rules (*i.e.* by two-thirds vote under Rule XXII).

73.

Under Rule XXII (quoted in paragraph 16), debate on a proposed amendment to the rules of the Senate cannot proceed over the objections of a single senator without the adoption of a cloture motion, which requires a two-thirds vote of senators present and voting – the same number of votes that would be required by Article V to pass an amendment to the Constitution.

74.

Senate Rule XXII conflicts with Art. I, § 5, cl. 2 of the Constitution which delegates to the Senate the power to adopt or amend its rules by majority vote.

75.

By declaring that the Rules of the Senate "continue from one Congress to the next unless changed as provided in these rules," Rule V, in combination with Rule XXII, also violates the fundamental constitutional principle that prohibits one Congress (or one house of Congress) from binding its successors.  The effect of the two rules is to make rules that were adopted by long-dead senators binding on successive generations of senators without their consent, and prevent the Senate from exercising the power granted by Art. I, § 5, c. 2 to amend its rules by a majority vote.

### Remedy

76.

The Court will not be required to rewrite Rule V or Rule XXII in order to grant plaintiffs complete relief from the unconstitutional effects of Rules V and XXII.

77.

The Court can grant plaintiffs complete relief by simply entering a judgment under 28 U.S.C. § 2201 declaring the italicized portions of Rule XXII unconstitutional, null and void and severing them from the remaining portions of Rule XXII, just as courts have severed unconstitutional portions of statutes:

> 22.2   Notwithstanding the provisions of rule II or rule IV or any other rule of the Senate, at any time a motion signed by sixteen Senators, to bring to a close the debate upon any measure … is presented to the Senate, the Presiding Officer, or clerk at the direction of the Presiding Officer, shall at once state the motion to the Senate, … he shall lay the motion before the Senate and direct that the clerk call the roll, and upon the ascertainment that a quorum is present, the Presiding Officer shall, without debate, submit to the Senate by a yea-and-nay vote the question:
>
> "Is it the sense of the Senate that the debate shall be brought to a close?"   And if that question shall be decided in the affirmative *by three-fifths of the Senators duly chosen and sworn – except on a measure or motion to amend the Senate rules, in which case the necessary affirmative vote shall be two-thirds of the Senators present and voting* then said measure … shall be the unfinished business to the exclusion of all other business until disposed of.

Senate Manual, pp. 20-21 (2011 ed.) (emphasis added).

78.

Once a declaratory judgment has been entered declaring the italicized portions of Rule XXII to be invalid, the "general rule of all parliamentary bodies is that, when a quorum is present, the act of a majority of the quorum [shall be] the act of the [Senate]" (*United States v. Ballin*, 144 U.S. 1, 6 (1892)) will apply to all future motions for cloture under Rule XXII, and the democratic principle of majority rule will be restored.

WHEREFORE, the plaintiffs respectfully pray:

## I. Primary Relief Under Count One and Count Two:

A.     that the Court enter a final judgment in plaintiffs' favor under Counts One and Two, pursuant to 28 U.S.C. § 2201, declaring the italicized portions of Rule XXII (quoted above in paragraphs 16 and 77) to be unconstitutional, null and void and severing the offending language from the remainder of the rule so that Rule XXII would then read as follows:

> 22.2   Notwithstanding the provisions of rule II or rule IV or any other rule of the Senate, at any time a motion signed by sixteen Senators, to bring to a close the debate upon any measure … is presented to the Senate, the Presiding Officer, or clerk at the direction of the Presiding Officer, shall at once state the motion to the Senate, … he shall lay the motion before the Senate and direct that the clerk call the roll, and upon the ascertainment that a quorum is present, the Presiding Officer shall, without debate, submit to the Senate by a yea-and-nay vote the question:

964611 1

> "Is it the sense of the Senate that the debate shall be brought to a
> close?"  And if that question shall be decided in the affirmative …
> then said measure … shall be the unfinished business to the exclusion
> of all other business until disposed of.

Senate Manual, pp. 20-21 (2011 ed.).

B.      that the Court enter a final judgment in plaintiffs' favor under Counts

One and Two, pursuant to 28 U.S.C. § 2201, declaring that no more than a vote of

a simple majority of a quorum in the Senate shall be required for passage of all

future motions for cloture under Rule XXII of the Standing Rules of the Senate.

## II.      Secondary Relief Under Count Three:

In the event that plaintiffs' claims under Count One and Two are denied,

plaintiffs respectfully pray in the alternative that the Court enter a judgment under

Count Three:

(1)     declaring Rule V of the Standing Rules of the Senate to be

unconstitutional; and

(2)     declaring that the rules of the Senate may be amended at any time

when a quorum is present by a vote of a simple majority.

## III.     Additional Relief:

In addition, plaintiffs respectfully pray that they be granted such other and

further relief as may be just and proper to afford them complete relief in their

rights under the Constitution and laws of the United States.

964611.1

This _14th_ day of ___May___, 2012.

Respectfully submitted,

_[signature]_

Emmet J. Bondurant
Georgia Bar No. 066900
bondurant@bmelaw.com
Kamal Ghali
Georgia Bar No. 805055
ghali@bmelaw.com

**Bondurant Mixson & Elmore LLP**
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309
Telephone:   (404) 881-4100
Facsimile:    (404) 881-4111

*Attorneys (pro hac vice pending) for Plaintiffs*

And

_[signature]_

Stephen Spaulding
Staff Counsel of Common Cause
D.C. Bar No. 1001633
SSpaulding@CommonCause.org

Common Cause
1133 19th Street, NW
Suite 900
Washington, DC  20036
Telephone:   202-736-5781
Facsimile:    202-659-3716

*Attorneys for Plaintiffs*

964611.1

52