# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:12–cv–00775–EGS

COMMON CAUSE et al v. BIDEN et al

Assigned to: Judge Emmet G. Sullivan

Cause: 28:2201 Declaratory Judgement

Date Filed: 05/14/2012

Jury Demand: None

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**COMMON CAUSE**
*on its own behalf and behalf of its members*

represented by **Stephen Spaulding**
COMMON CAUSE
1133 19th Street, NW
Washington, DC 20036
(202) 736–5781
Email: sspaulding@commoncause.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
BONDURANT, MIXSON &ELMORE
IBM Tower
1201 West Peachtree Street, NW
Atlanta, GA 30309
(404) 881–4100
Email: bondurant@bmelaw.com
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
BONDURANT, MIXSON &ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, NW
Suite 3900
Atlanta, GA 30309
(404) 881–4100
Email: ghali@bmelaw.com
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

**Plaintiff**

**JOHN LEWIS**
*Representative, Individually and in his official capacity as a member of the United States House of Representatives*

represented by **Stephen Spaulding**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

**Plaintiff**

**MICHAEL MICHAUD**
*Representative, Individually and in his official capacity as a member of the United States House of Representatives*

represented by **Stephen Spaulding**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

**Plaintiff**

**HENRY JOHNSON**
*Representative, ("Hank") Individually and in his official capacity as a member of the United States House of Representatives*

represented by **Stephen Spaulding**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

**Plaintiff**

**KEITH ELLISON**
*Representative, Individually and in his official capacity as a member of the United States House of Representatives*

represented by **Stephen Spaulding**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)

**Plaintiff**

| ERIKA ANDIOLA | represented by | **Stephen Spaulding** |
|---|---|---|

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

**Plaintiff**

| CELSO MIRELES | represented by | **Stephen Spaulding** |
|---|---|---|

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

**Plaintiff**

| CAESAR VARGAS | represented by | **Stephen Spaulding** |
|---|---|---|

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emmet J. Bondurant**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kamal Ghali**
(See above for address)
*TERMINATED: 10/24/2012*
*PRO HAC VICE*

V.

**Defendant**

**JOSEPH R. BIDEN, JR.**
*in his official capacity as President of the*
*United States Senate*

represented by **Morgan John Frankel**
OFFICE OF SENATE LEGAL COUNSEL
United States Senate
642 Hart Senate Office Building
Washington, DC 20510–7250
(202) 224–4435
Fax: (202) 224–3391
Email: morgan_frankel@legal.senate.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grant Raymond Vinik**
U.S. SENATE
Senate Legal Counsel
642 Hart Senate Office Building
2nd and Constitution Ave. NE
Washington, DC 20510
(202) 224–4435
Fax: (202) 224–3391
Email: grant_vinik@legal.senate.gov
*ATTORNEY TO BE NOTICED*

**Patricia M. Bryan**
OFFICE OF SENATE LEGAL COUNSEL
642 Hart Senate Office Building
United States Senate
Washington, DC 20510–7250
(202) 224–4435
Fax: (202) 224–3391
Email: pat_bryan@legal.senate.gov
*ATTORNEY TO BE NOTICED*

**Thomas Edward Caballero**
OFFICE OF SENATE LEGAL COUNSEL
642 Hart Senate Office Building
Washington, DC 20510–7250
(202) 224–4435
Fax: (202) 224–3391
Email: thomas_caballero@legal.senate.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**NANCY ERICKSON**
*in her official capacity as Secretary of the*
*United States Senate*

represented by **Morgan John Frankel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grant Raymond Vinik**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Patricia M. Bryan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Edward Caballero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | |
|---|---|
| **ELIZABETH MACDONOUGH**<br>*in her official capacity in*<br>*Parliamentarian of the United States*<br>*Senate* | represented by **Morgan John Frankel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Grant Raymond Vinik**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Patricia M. Bryan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Thomas Edward Caballero**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | |
|---|---|
| **TERRANCE W. GAINER**<br>*in his official capacity as*<br>*Sergeant−at−Arms of the United States*<br>*Senate* | represented by **Morgan John Frankel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Grant Raymond Vinik**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Patricia M. Bryan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Thomas Edward Caballero**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/14/2012 | 1 | | COMPLAINT against JOSEPH R. BIDEN, NANCY ERICKSON, |

| Date | No. | Description |
|---|---|---|
| | | TERRANCE W. GAINER, ELIZABETH MACDONOUGH ( Filing fee $ 350, receipt number 4616048148) filed by COMMON CAUSE, KEITH ELLISON, MICHAEL MICHAUD, ERIKA ANDIOLA, CAESAR VARGAS, CELSO MIRELES, HENRY JOHNSON, JOHN LEWIS. (Attachments: # 1 Civil Cover Sheet)(jf, ) (Entered: 05/14/2012) |
| 05/14/2012 | | Summons (4) Issued as to JOSEPH R. BIDEN, NANCY ERICKSON, TERRANCE W. GAINER, ELIZABETH MACDONOUGH. (jf, ) (Entered: 05/14/2012) |
| 05/14/2012 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by COMMON CAUSE (jf, ) (Entered: 05/14/2012) |
| 05/14/2012 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Emmet J. Bondurant, :Firm– BONDURANT MIXSON &ELMORE LLP, :Address– 1201 West Peachtree Street, NW, Atlanta, GA 30309. Phone No. – (404) 881–4100. by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Attachments: # 1 Text of Proposed Order)(jf, ) (Entered: 05/14/2012) |
| 05/14/2012 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kamal Ghali, :Firm– BONDURANT MIXSON &ELMORE LLP, :Address– 1201 West Peachtree Street, NW, Atlanta, GA 30309. Phone No. – (404) 881–4100. by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Attachments: # 1 Text of Proposed Order)(jf, ) (Entered: 05/14/2012) |
| 05/14/2012 | | SUMMONS (2) Issued as to, U.S. Attorney and U.S. Attorney General (jf, ) (Entered: 05/15/2012) |
| 05/16/2012 | | MINUTE ORDER granting 3 Plaintiffs' Motion for Leave to Appear Pro Hac Vice. Emmet J. Bondurant is hereby admitted pro hac vice in this action. Signed by Judge Emmet G. Sullivan on May 16, 2012. (lcegs6) (Entered: 05/16/2012) |
| 05/16/2012 | | MINUTE ORDER granting 4 Plaintiffs' Motion for Leave to Appear Pro Hac Vice. Kamal Ghali is hereby admitted pro hac vice in this action. Signed by Judge Emmet G. Sullivan on May 16, 2012. (lcegs6) (Entered: 05/16/2012) |
| 06/12/2012 | 5 | NOTICE of Appearance by Morgan John Frankel on behalf of All Defendants (Frankel, Morgan) (Entered: 06/12/2012) |
| 06/12/2012 | 6 | NOTICE of Appearance by Thomas Edward Caballero on behalf of All Defendants (Caballero, Thomas) (Entered: 06/12/2012) |
| 06/12/2012 | 7 | NOTICE of Appearance by Patricia M. Bryan on behalf of All Defendants (Bryan, Patricia) (Entered: 06/12/2012) |
| 06/12/2012 | 8 | NOTICE of Appearance by Grant Raymond Vinik on behalf of All Defendants (Vinik, Grant) (Entered: 06/12/2012) |
| 06/15/2012 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOSEPH R. BIDEN served on 5/21/2012; NANCY ERICKSON served on 5/21/2012; TERRANCE W. GAINER served on 5/21/2012; ELIZABETH |

| | | | |
|---|---|---|---|
| | | | MACDONOUGH served on 5/21/2012, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 05/21/2012. (Ghali, Kamal) (Entered: 06/15/2012) |
| 06/15/2012 | 10 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/17/2012. Answer due for ALL FEDERAL DEFENDANTS by 7/16/2012. (Ghali, Kamal) (Entered: 06/15/2012) |
| 07/16/2012 | 11 | | Unopposed MOTION for Extension of Time to File Answer by JOSEPH R. BIDEN, NANCY ERICKSON, TERRANCE W. GAINER, ELIZABETH MACDONOUGH (Attachments: # 1 Text of Proposed Order)(Caballero, Thomas) (Entered: 07/16/2012) |
| 07/18/2012 | | | MINUTE ORDER granting 11 defendants' unopposed motion for extension of time. Defendants shall answer or otherwise respond to the complaint by no later than July 23, 2012. Signed by Judge Emmet G. Sullivan on July 18, 2012. (lcegs6) (Entered: 07/18/2012) |
| 07/19/2012 | | | Set/Reset Deadlines: Defendants shall answer or otherwise respond to the complaint due by 7/23/2012 (tcb) (Entered: 07/19/2012) |
| 07/20/2012 | 12 | | MOTION to Dismiss by JOSEPH R. BIDEN, NANCY ERICKSON, TERRANCE W. GAINER, ELIZABETH MACDONOUGH (Attachments: # 1 Exhibit, # 2 Exhibit)(Frankel, Morgan) (Entered: 07/20/2012) |
| 07/27/2012 | 13 | | Joint MOTION for Extension of Time to *File Plaintiffs' Opposition to Defendants' Motion to Dismiss and Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss* by ERIKA ANDIOLA, JOSEPH R. BIDEN, COMMON CAUSE, KEITH ELLISON, NANCY ERICKSON, TERRANCE W. GAINER, HENRY JOHNSON, JOHN LEWIS, ELIZABETH MACDONOUGH, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Attachments: # 1 Text of Proposed Order)(Spaulding, Stephen) (Entered: 07/27/2012) |
| 07/30/2012 | | | MINUTE ORDER granting 13 the parties' joint motion for extension of time. Plaintiffs shall file their opposition to 12 defendants' motion to dismiss by no later than August 27, 2012. Defendants shall file their reply memorandum by no later than September 18, 2012. Signed by Judge Emmet G. Sullivan on July 30, 2012. (lcegs6) (Entered: 07/30/2012) |
| 07/31/2012 | | | Set/Reset Deadlines: Response to Dispositive Motions due by 8/27/2012. Reply to Dispositive Motions due by 9/18/2012. (clv, ) (Entered: 07/31/2012) |
| 08/20/2012 | 14 | | Unopposed MOTION for Leave to File Excess Pages *in Opposition to Defendants' Motion to Dismiss* by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Attachments: # 1 Text of Proposed Order)(Spaulding, Stephen) (Entered: 08/20/2012) |
| 08/20/2012 | | | MINUTE ORDER granting 14 plaintiffs' unopposed motion for leave to file excess pages. Plaintiffs' memorandum of points and authorities in opposition to defendants' motion to dismiss shall not exceed 70 pages. Signed by Judge Emmet G. Sullivan on August 20, 2012. (lcegs6) (Entered: 08/20/2012) |

| | | | |
|---|---|---|---|
| 08/27/2012 | 15 | | Memorandum in opposition to re 12 MOTION to Dismiss filed by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Bondurant, Emmet) (Entered: 08/27/2012) |
| 09/18/2012 | 16 | | REPLY to opposition to motion re 12 MOTION to Dismiss filed by JOSEPH R. BIDEN, NANCY ERICKSON, TERRANCE W. GAINER, ELIZABETH MACDONOUGH. (Frankel, Morgan) (Entered: 09/18/2012) |
| 10/10/2012 | | | MINUTE ORDER. The Court hereby schedules a hearing on 12 Defendants' Motion to Dismiss. The hearing shall take place on December 3, 2012 at 10:30 a.m. in Courtroom 24A. Signed by Judge Emmet G. Sullivan on October 10, 2012. (lcegs6) (Entered: 10/10/2012) |
| 10/11/2012 | | | Set/Reset Hearings: Motion Hearing set for 12/3/2012 10:30 AM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 10/11/2012) |
| 10/17/2012 | 17 | | Unopposed MOTION to Amend/Correct 1 Complaint, by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Attachments: # 1 Exhibit A – Plaintiffs' Correction of Complaint, # 2 Text of Proposed Order)(Bondurant, Emmet) (Entered: 10/17/2012) |
| 10/17/2012 | | | MINUTE ORDER granting 17 plaintiffs' unopposed motion for leave to correct the complaint. The record shall reflect that plaintiffs have withdrawn paragraph 9.D.(2)(c) of 1 the complaint in this matter. Signed by Judge Emmet G. Sullivan on October 17, 2012. (lcegs6) (Entered: 10/17/2012) |
| 10/17/2012 | 18 | | SUPPLEMENT to re 1 Complaint, filed by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS. (jf, ) (Entered: 10/18/2012) |
| 10/23/2012 | 19 | | NOTICE *of Withdrawal of Counsel* by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Ghali, Kamal) (Entered: 10/23/2012) |
| 11/26/2012 | | | MINUTE ORDER. Due to the Court's calendar, the hearing previously scheduled for December 3, 2012 is hereby rescheduled for December 10, 2012 at 10:30 a.m. in Courtroom 24A. The Court regrets any inconvenience to the parties. Signed by Judge Emmet G. Sullivan on November 26, 2012. (lcegs6) (Entered: 11/26/2012) |
| 11/27/2012 | | | Set/Reset Hearings: Motion Hearing set for 12/10/2012 10:30 AM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 11/27/2012) |
| 11/29/2012 | | | MINUTE ORDER. Due to the Court's calendar, the hearing previously scheduled for December 10, 2012 at 10:30 a.m. is hereby rescheduled for 9:30 a.m. on that same date in Courtroom 24A. PLEASE NOTE THE TIME CHANGE. The Court regrets any inconvenience to the parties. Signed by Judge Emmet G. Sullivan on November 29, 2012. (lcegs6) (Entered: |

| | | |
|---|---|---|
| | | 11/29/2012) |
| 11/30/2012 | | Set/Reset Hearings: Motion Hearing set for 12/10/2012 09:30 AM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 11/30/2012) |
| 12/05/2012 | | MINUTE ORDER. At the upcoming hearing on 12 Defendants' Motion to Dismiss, although the parties should be prepared to discuss all arguments made in the briefs, the parties are directed to be prepared in particular to address Plaintiffs' vote nullification theory of standing as applied to the House Member Plaintiffs. Signed by Judge Emmet G. Sullivan on December 5, 2012. (lcegs6) (Entered: 12/05/2012) |
| 12/10/2012 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Motion Hearing held and taken under advisement on 12/10/2012 re 12 MOTION to Dismiss; (Court Reporter CATALINA KERR.) (clv, ) (Entered: 12/10/2012) |
| 12/10/2012 | | MINUTE ORDER. Pursuant to the hearing held on December 10, 2012, the Court has reconsidered and hereby modifies the request made at the conclusion of the hearing. Defendants are directed to file, by no later than Wednesday, December 12, 2012 at 6:00 p.m., a supplemental memorandum of no more than 3 pages providing points and authorities in support of the proposition that a court may address political question doctrine without reaching the issue of standing. Defendants need not address the other questions raised by the Court. Signed by Judge Emmet G. Sullivan on December 10, 2012. (lcegs6) (Entered: 12/10/2012) |
| 12/10/2012 | | Set/Reset Deadlines: Defendant's supplemental memorandum due by 6:00 p.m. on 12/12/2012. (clv, ) (Entered: 12/10/2012) |
| 12/11/2012 | 20 | MEMORANDUM re Order,, by JOSEPH R. BIDEN, JR, NANCY ERICKSON, TERRANCE W. GAINER, ELIZABETH MACDONOUGH. (Frankel, Morgan) (Entered: 12/11/2012) |
| 12/12/2012 | 21 | MOTION for Leave to File *A Reply to Defendants' Memorandum of December 11, 2012 (Dkt. 20)* by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS (Bondurant, Emmet) (Entered: 12/12/2012) |
| 12/12/2012 | 22 | ERRATA *to Plaintiffs' Reply to Defendants' Supplemental Memorandum* by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS 21 MOTION for Leave to File *A Reply to Defendants' Memorandum of December 11, 2012 (Dkt. 20)* filed by CAESAR VARGAS, CELSO MIRELES, COMMON CAUSE, JOHN LEWIS, HENRY JOHNSON, ERIKA ANDIOLA, MICHAEL MICHAUD, KEITH ELLISON. (Bondurant, Emmet) (Entered: 12/12/2012) |
| 12/12/2012 | | MINUTE ORDER treating as opposed and granting over objection 21 Plaintiffs' Motion for Leave to File a Reply to Defendants' Supplemental Memorandum. The Supplemental Reply attached as exhibit 1 to 22 Plaintiffs' Errata to Plaintiffs' motion is hereby deemed filed. The parties are reminded of this Court's Local Rules, which state that "[b]efore filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with |

| | | | |
|---|---|---|---|
| | | | opposing counsel, either in person or by telephone, in a good faith effort to determine whether there is any opposition to the relief sought.... A party shall include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed." LCvR 7(m). It is FURTHER ORDERED that no additional filings on the Motion to Dismiss shall be made without invitation of the Court. Signed by Judge Emmet G. Sullivan on December 12, 2012. (lcegs6) (Entered: 12/12/2012) |
| 12/12/2012 | 23 | | REPLY re 20 Memorandum re Order filed by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS. (jf, ) (Entered: 12/12/2012) |
| 12/21/2012 | 24 | 60 | ORDER granting 12 Motion to Dismiss. Signed by Judge Emmet G. Sullivan on December 21, 2012. (lcegs6) (Entered: 12/21/2012) |
| 12/21/2012 | 25 | 13 | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on December 21, 2012. (lcegs6) (Entered: 12/21/2012) |
| 12/21/2012 | 26 | 11 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 25 Memorandum &Opinion, 24 Order on Motion to Dismiss by ERIKA ANDIOLA, COMMON CAUSE, KEITH ELLISON, HENRY JOHNSON, JOHN LEWIS, MICHAEL MICHAUD, CELSO MIRELES, CAESAR VARGAS. Filing fee $ 455, receipt number 0090–3170987. Fee Status: Fee Paid. Parties have been notified. (Bondurant, Emmet) (Entered: 12/21/2012) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMON CAUSE, *et. al.* | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO. 12-cv-0775(EGS) |
| JOSEPH R. BIDEN, *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

## **NOTICE OF APPEAL**

All Plaintiffs in the above-styled action respectfully give notice that they appeal to the

United States Court of Appeals for the District of Columbia Circuit from the granting the

Defendants' motion to dismiss entered in this action on December 21, 2012.  Plaintiffs seek

review of that order [Dkt. Nos. 24-25].

Respectfully submitted this 21st day of December, 2012.


/s/ *Emmet J. Bondurant*
Emmet J. Bondurant
**Bondurant Mixson & Elmore LLP**        Georgia Bar No. 066900
3900 One Atlantic Center                 bondurant@bmelaw.com
1201 W. Peachtree Street
Atlanta, Georgia  30309
Telephone:      (404) 881-4100
Facsimile:      (404) 881-4111


/s/ *Stephen Spaulding*
Stephen Spaulding
**Common Cause**                          Staff Counsel of Common Cause
1133 19th Street, NW                       D.C. Bar No. 1001633
Suite 900                                  SSpaulding@CommonCause.org
Washington, DC  20036
Telephone:      202-736-5781
Facsimile:      202-659-3716


***Attorneys for Plaintiffs***

1034143.1

1

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the within and foregoing

**NOTICE OF APPEAL** with the Clerk of Court using the CM/ECF system, which will

automatically send e-mail notification of such filing to the following attorneys of record:

Morgan J. Frankel (morgan_frankel@legal.senate.gov)
Grant R. Vinik (grant_vinik@legal.senate.gov)
Patricia M. Bryan (pat_bryan@legal.senate.gov)
Thomas E. Caballero (thomas_caballero@legal.senate.gov)
Office of Senate Legal Counsel
United States Senate
642 Hart Senate Office Building
Washington, DC  20510-7250

This 21st day of December, 2012.

*/s/ Emmet J. Bondurant*
Emmet J. Bondurant

```
                                )
COMMON CAUSE, et al.,           )
                                )
                                )
            Plaintiffs,         )
                                ) Civil Action No. 12-775 (EGS)
        v.                      )
                                )
JOSEPH R. BIDEN, JR.,           )
in his official capacity as     )
President of the United States  )
Senate, et al.,                 )
                                )
            Defendants.         )
                                )
```

## MEMORANDUM OPINION

Plaintiffs in this action are a non-profit organization devoted to government accountability and election reform, four members of the United States House of Representatives, and three individuals who allege they would have benefitted from the DREAM Act. They bring this suit against representatives of the United States Senate seeking a declaratory judgment that Rule XXII (the "Cloture Rule" or the "Filibuster Rule") -- which requires a vote of sixty senators to proceed with or close debate on bills or presidential nominations and a two-thirds vote to proceed with or close debate on proposed amendments to the Senate Rules -- is unconstitutional because it is "inconsistent with the principle of majority rule." In the alternative, Plaintiffs challenge Senate Rule V, which provides that the Senate's rules

continue from one Congress to the next, unless amended.  Pending
before the Court is Defendants' Motion to Dismiss pursuant to
Rule 12(b)(1) of the Federal Rules of Civil Procedure.
Defendants make three arguments: (1) Plaintiffs lack standing to
bring this suit; (2) the Speech or Debate Clause bars this suit;
and (3) the Complaint presents a non-justiciable political
question.

The Court acknowledges at the outset that the Filibuster
Rule is an important and controversial issue.  As Plaintiffs
allege, in recent years, even the mere threat of a filibuster is
powerful enough to completely forestall legislative action.
However, this Court finds itself powerless to address this issue
for two independent reasons.  First, the Court cannot find that
any of the Plaintiffs have standing to sue.  Standing is the
bedrock requirement of an Article III court's jurisdiction to
resolve only those cases that present live controversies.  While
the House Members have presented a unique posture, the Court is
not persuaded that their alleged injury -- vote nullification --
falls into a narrow exception enunciated by the Supreme Court in
*Raines v. Byrd*.  And none of the other Plaintiffs have
demonstrated that this Court can do anything to remedy the
alleged harm they have suffered: the inability to take advantage
of the opportunity to benefit from proposed legislation that was
never debated, let alone enacted.  The Court is even less

2

persuaded that the Plaintiffs possess a "procedural" right,
grounded in the text of the Constitution, that entitles them to
the majority enactment of legislation.  Second, and no less
important, the Court is firmly convinced that to intrude into
this area would offend the separation of powers on which the
Constitution rests.  Nowhere does the Constitution contain
express requirements regarding the proper length of, or method
for, the Senate to debate proposed legislation.  Article I
reserves to each House the power to determine the rules of its
proceedings.  And absent a rule's violation of an express
constraint in the Constitution or an individual's fundamental
rights, the internal proceedings of the Legislative Branch are
beyond the jurisdiction of this Court.

Accordingly, upon consideration of Defendants' Motion to
Dismiss, the response and reply thereto, the supplemental briefs
filed by the parties, the arguments made at the hearing held on
December 10, 2012, the relevant law, the entire record in this
case, and for the reasons stated below, the Court will **GRANT**
Defendants' Motion to Dismiss.

## I.  BACKGROUND

### A.  History of the Cloture Rule

The Complaint sets forth the following background regarding
the history of the Cloture Rule.  At the time the Constitution
was adopted, there was no recognized "right" on the part of

3

members of legislative or other parliamentary bodies to engage in unlimited debate over the objections of the majority (*i.e.*, to "filibuster"). Compl. ¶ 20. Under the established rules of parliamentary procedure that prevailed both in England and in the Continental Congress prior to the adoption of the Constitution, the majority had the power to end a debate and bring a measure to an immediate vote at any time over the objection of the minority by adopting a "motion for the previous question." *Id.* ¶ 21. The Articles of Confederation were an exception, however; under the Articles of Confederation, voting was by state, and the "United States in Congress" was unable to take action without a supermajority vote of nine of the thirteen states. *Id.* ¶ 24. Because the Framers of the Constitution had observed first-hand the paralysis caused by the supermajority voting requirement in the Articles of Confederation, the Framers refused to require more than a majority, either as a condition of a quorum or for the passage of legislation under the proposed new constitution. *Id.* ¶ 25. Only six exceptions to the principle of majority rule were expressly enumerated in the Constitution.[1]

---

[1] (1) Impeachments, U.S. Const. art. 1, § 3, cl. 6; (2) expelling members, U.S. Const. art. 1, § 5, cl. 2; (3) overriding a Presidential veto of a bill, U.S. Const. art. 1 , § 7, cl. 2; (4) overriding a Presidential veto of an Order, Resolution or Vote, U.S. Const. art. 1, § 7, cl. 3; (5) ratification of treaties by the Senate, U.S. Const. art. 2, § 2,

4

The first rules adopted by the Senate in 1789 adopted the previous question motion. *Id.* ¶ 37. In 1806, however, the previous question motion was eliminated from the rules of the Senate, apparently at the urging of Vice President Aaron Burr, who, in his farewell address before the Senate in 1805, suggested that the previous question motion was unnecessary because it had been invoked only once during the four years that he had presided over the Senate. *Id*. ¶ 38. From 1806 until 1917, the Senate had no rule that allowed the majority to limit debate or terminate a filibuster. Despite the absence of a rule for limiting debate, filibusters were relatively rare during this period and occurred at an average rate of one every three years between 1840 and 1917. *Id*. ¶ 40. In 1917, however, after a small minority of senators filibustered a bill authorizing President Wilson to arm American merchant ships, leading to public outrage, the Senate adopted the predecessor to the current Cloture Rule. *Id.* ¶¶ 41-43. The 1917 rule required a two-thirds vote of the Senate to end debate. *Id.* ¶ 45. Filibusters remained relatively rare from 1917 to 1970.

---

cl. 2; and (6) amendments to the Constitution, U.S. Const. art. V. In addition, two exceptions were subsequently added by amendment: (1) removal of the disability to hold public office of any person who engaged in insurrection or rebellion against the United States, U.S. Const. amend. XIV, § 3; and (2) a determination that the President is unable to discharge the powers and duties of his office, U.S. Const. amend. XXV, § 4. *See* Compl. ¶¶ 26-27.

The Cloture Rule was not amended again until 1975, when the Senate agreed to a compromise amendment to Rule XXII. The amendment changed the number of votes required for cloture from two-thirds of senators present and voting to three-fifths of the Senate, not merely those present and voting (*i.e.*, sixty votes). In addition, the amendment provided that cloture on motions to amend the Senate's rules would continue to require a vote of two-thirds of senators present and voting. The number of votes required to invoke cloture has not changed since 1975. *See* Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 8. Rule XXII of the Standing Rules of the Senate provides in pertinent part as follows:

> [A]t any time a motion signed by sixteen Senators, to bring to a close the debate upon any measure . . . is presented to the Senate, the Presiding Officer, or clerk at the direction of the Presiding Officer, shall at once state the motion to the Senate, and . . . he shall lay the motion before the Senate and direct that the clerk call the roll, and upon the ascertainment that a quorum is present, the Presiding Officer shall, without debate, submit to the Senate by a yea-and-nay vote the question:

> "Is the sense of the Senate that the debate shall be brought to a close?" And if that question shall be decided in the affirmative by three-fifths of the Senators duly chosen and sworn -- except on a measure or motion to amend the Senate rules, in which case the necessary affirmative vote shall be two-thirds of the Senators present and voting -- then said measure . . . shall be the unfinished business to the exclusion of the all other business until disposed of.

Standing Rules of the Senate Rule XXII § 2; *see also* Compl. ¶ 16. Rule V states that the "rules of the Senate shall continue

6

from one Congress to the next Congress unless they are changed as provided in these rules." Standing Rules of the Senate Rule V § 2.

The number of actual or threatened filibusters has increased dramatically since 1970, and now dominates the business of the Senate. Compl. ¶ 47. In 2009, there were a record sixty-seven filibusters in the first half of the 111th Congress -- double the number of filibusters that occurred in the entire twenty-year period between 1950 and 1969. By the time the 111th Congress adjourned in December 2010, the number of filibusters had swelled to 137 for the entire two-year term of the 111th Congress. *Id.* ¶ 50. During the 111th Congress, over four hundred bills that had been passed by the House of Representatives -- many with broad bipartisan support -- died in the Senate without ever having been debated or voted on because of the inability to obtain the sixty votes required by Rule XXII. *Id.* ¶ 52.

## B. Allegations in the Complaint

The Complaint is brought by three groups of Plaintiffs. Plaintiff Common Cause is a non-profit corporation formed "to serve as a grass roots 'citizens lobby' to promote the adoption of campaign finance, disclosure and other election reform legislation by Congress and by state and local governments." *Id.* ¶ 9(A). Plaintiffs John Lewis, Michael Michaud, Henry

7

("Hank") Johnson, and Keith Ellison (the "House Member Plaintiffs"), are members of the House of Representatives representing Georgia, Maine, Georgia, and Minnesota, respectively. *Id.* ¶ 9(B). Finally, Plaintiffs Erika Andiola, Celso Mireles, and Caesar Vargas (the "DREAM Act Plaintiffs"), are three U.S. residents who were born in Mexico, brought to the United States by their families when they were children, and subsequently graduated from college and obtained employment. *Id.* ¶ 9(C). Each group of Plaintiffs alleges that it has suffered injury due to the Cloture Rule preventing a majority in the Senate from closing debate on and passing legislation that would have benefitted the Plaintiffs -- specifically, the DISCLOSE Act, a campaign finance reform bill, and the DREAM Act, an immigration reform bill. *See id.* ¶¶ 9(D)-(E).

Plaintiffs allege that the Cloture Rule "replaces majority rule with rule by the minority by requiring the affirmative votes of 60 senators on a motion for cloture before the Senate is allowed to even debate or vote on" measures before it. *Id.* ¶ 2. According to Plaintiffs, "[b]oth political parties have used Rule XXII when they were in the minority in the Senate to prevent legislation and appointments proposed by the opposing party from being debated or voted on by the Senate." *Id.* ¶ 4. Plaintiffs further assert that Rule XXII has primarily been used "not to protect the right of the minority to debate the merits

8

of a bill or the fitness of a presidential nominee on the floor
of the Senate . . . . , but to *suppress and prevent the majority
from debating* the merits of bills or presidential appointments
opposed by the minority." *Id.* ¶ 7 (emphasis in original).
"Actual or threatened filibusters (or objections to the
commencement of debate which are the functional equivalent of a
filibuster) have become so common that it is now virtually
impossible as a practical matter for the majority in the Senate
to pass a significant piece of legislation or to confirm many
presidential nominees without the 60 votes required to invoke
cloture under Rule XXII." *Id.* ¶ 18.  Plaintiffs allege that
because invoking cloture is "time consuming and cumbersome," the
mere threat of a filibuster is sufficient to forestall
consideration of a measure. *Id.* ¶ 15.  Furthermore, because
Senate Rule V provides that Senate rules continue from one
Congress to the next, and because invoking cloture to close
debate on any resolution to amend Senate rules requires the
affirmative vote of two-thirds of Senators present and voting,
Plaintiffs assert that "the combination of Rule V and Rule XXII
has made it virtually impossible for the majority in the Senate
to amend the rules of the Senate to prevent the minority in the
Senate from obstructing the business of the Senate by
filibustering." *Id.* ¶ 19.

The Complaint asserts that the Filibuster Rule is invalid because it conflicts with the following constitutional provisions and/or principles:  the Senate's Rulemaking Power, U.S. Const. art. I, § 5, cl. 2, Compl. ¶¶ 57-59; the Quorum Clause, U.S. Const. art. 1, § 5, *id.* ¶ 60(a); the Presentment Clause, U.S. Const. art. I, § 7, *id.* ¶ 60(b); "the exclusive list of exceptions" to majority rule, *id.* ¶ 60(c); the power of the Vice President to vote when the Senate is "equally divided," U.S. Const. art. I, § 3, cl. 4, *id.* ¶ 60(d); the Advice and Consent Clause, U.S. Const. art. II, § 2, cl. 2, *id.* ¶ 60(e); the "equal representation of each state in the Senate," *id.* ¶ 60(f); "the finely wrought and exhaustively considered balance of the Great Compromise" regarding representation of states in Congress, *id.* ¶¶ 62-70 (internal quotation marks and citation omitted); the power of the Senate "to adopt or amend its rules by majority vote," *id.* ¶ 74; and "the fundamental constitutional principle that prohibits one Congress (or one house of Congress) from binding its successors," *id.* ¶ 75.  Plaintiffs seek the entry of a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring the supermajority vote portions of Rule XXII unconstitutional.  Plaintiffs request that the Court sever the unconstitutional portions of that Rule and declare that a vote of a simple majority is all that is required to invoke cloture. Secondarily, and in the alternative, Plaintiffs seek the entry

of a judgment declaring Rule V unconstitutional to the extent that it prohibits the Senate from amending its rules by majority vote.

### C.    Procedural Background

On May 14, 2012, Plaintiffs filed their Complaint against Vice President Joseph R. Biden, Jr., in his official capacity as President of the Senate, Nancy Erickson, in her official capacity as Secretary of the Senate, Elizabeth MacDonough, in her official capacity as Parliamentarian of the Senate, and Terrance Gainer, in his official capacity as Sergeant-at-Arms of the Senate. Defendants filed a Motion to Dismiss on July 20, 2012, and the Court heard argument on the motion on December 10, 2012. The motion is ripe for determination by the Court.

## II.    STANDARD OF REVIEW

Federal district courts are courts of limited jurisdiction, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994), and a Rule 12(b)(1) motion for dismissal presents a threshold challenge to a court's jurisdiction, *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the Court has jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In evaluating such a motion, the Court must "accept[] all of the factual allegations in [the] complaint as true," *Jerome Stevens Pharms.,*

11

*Inc. v. FDA*, 402 F.3d 1249, 1250 (D.C. Cir. 2005) (citation omitted), but the Court "is not required . . . to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations," *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 193 (D.D.C. 2007) (citation omitted). In addition, the Court may consider materials outside the pleadings where necessary to resolve disputed jurisdictional facts. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).[2]

## III. ANALYSIS

The Court first addresses Plaintiffs' standing to sue.[3] The Court finds that Plaintiffs' attempt to invoke procedural

---

[2] The Court follows the weight of authority in the D.C. Circuit in construing the political question doctrine as a threshold challenge to the Court's jurisdiction pursuant to Rule 12(b)(1). *See, e.g.*, *Lin v. United States*, 561 F.3d 502, 504 (D.C. Cir. 2009) (affirming dismissal of complaint for lack of subject matter jurisdiction based on the political question doctrine); *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) ("The principle that the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary is as old as the fundamental principle of judicial review." (internal quotation marks and citation omitted)). Even were the Court to treat political question doctrine as a Rule 12(b)(6) ground, rather than a Rule 12(b)(1) challenge to the Court's jurisdiction, the Court would nonetheless conclude that it lacks authority to decide this case.

[3] Although the Court may dismiss the Complaint on any jurisdictional threshold ground, *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999), the D.C. Circuit has counseled that standing should be addressed before political question doctrine, *see Reuss v. Balles*, 584 F.2d 461, 465 n.14 (D.C. Cir.

12

standing fails because Plaintiffs have failed to identify a
procedural right that protects their concrete, particularized
interests.  In addition, each group of plaintiffs has failed to
demonstrate Article III standing because they have not
demonstrated an injury-in-fact that is caused by the Cloture
Rule and that would be redressable by any action of this Court.
Finally, the Court finds that this case presents a non-
justiciable political question and that dismissal is appropriate
on that basis as well.

### A.    Standing

Article III of the Constitution restricts the jurisdiction
of the federal courts to adjudicating actual "cases" and
"controversies."  U.S. Const. art. III, § 2; *see also Allen v.
Wright*, 468 U.S. 737, 750 (1984).  This requirement has given
rise to "several doctrines . . . 'founded in concern about the
proper -- and properly limited -- role of the courts in a
democratic society.'"  *Allen*, 468 U.S. at 750 (quoting *Warth v.
Seldin*, 422 U.S. 490, 498 (1975)); *see also Valley Forge
Christian Coll. v. Ams. United for Separation of Church and
State*, 454 U.S. 464, 471 (1982).  One aspect of this "case-or-
controversy" requirement is that plaintiffs must have standing
to sue, an inquiry that focuses on whether the litigant is

---

1978).  Indeed, the Supreme Court has stated that standing is
"the most important of the jurisdictional doctrines."  *FW/PBS,
Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (citation omitted).

entitled to have the court decide the merits of the dispute. *Allen*, 468 U.S. at 750-51 (quoting *Warth*, 422 U.S. at 498).

To establish the "irreducible constitutional minimum" of Article III standing, a plaintiff must show that: (1) he has suffered an "injury in fact" which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and the conduct complained of that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (citations omitted). The standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). If the Court finds that one of the Plaintiffs has standing, it need not consider the standing of the other Plaintiffs. *See Tozzi v. Dep't of Health and Human Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001). In assessing Plaintiffs' standing, the Court assumes that Plaintiffs will prevail on the merits of their constitutional claims. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008).

14

### 1. Procedural Standing

Plaintiffs argue that they have procedural standing, a more relaxed version of the standing doctrine. *See* Pls.' Opp'n to Mot. to Dismiss ("Pls.' Opp'n") at 31-33. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 573 n.7. As the D.C. Circuit has recognized, "where plaintiffs allege injury resulting from violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax--while not wholly eliminating--the issues of imminence and redressability, but not the issues of injury in fact or causation." *Center for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). Thus, the D.C. Circuit has held that plaintiffs have procedural standing only if, *inter alia*, (1) the government violated their procedural rights designed to protect their threatened, concrete interest, and (2) the violation resulted in injury to their concrete, particularized interest. *Id.* However, the procedural standing doctrine "does not -- and cannot -- eliminate any of the 'irreducible' elements of standing[.]" *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). For the reasons discussed below, the Court concludes that Plaintiffs have failed to demonstrate that they have a "procedural right" to enactment

15

of legislation by a simple majority.  Moreover, Plaintiffs have failed to show that any such right was designed to protect their particularized interest.

In *Lujan*, the Supreme Court offered two examples of procedures designed to protect a party's concrete interest: (1) the requirement for a hearing prior to a denial of a license application is designed to protect the applicant, and (2) the requirement that a federal agency prepare an environmental impact statement before conducting a major federal action such as constructing a dam is designed to protect neighbors of the proposed dam.  *See* 504 U.S. at 572.  Thus, for example, the D.C. Circuit has found procedural standing where a plaintiff alleged that the FAA authorized certain runway use at a local airport without performing an environmental assessment.  The court stated "[t]he procedural requirements of NEPA were designed to protect persons . . . who might be injured by hasty federal actions taken without regard for possible environmental consequences. . . . And [plaintiff] has adequately demonstrated that the FAA's failure to follow the NEPA procedures poses a 'distinct risk' to his 'particularized interests'--given the location of his home, he is uniquely susceptible to injury resulting from increased use of the secondary runways." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (citation omitted).

Here, Plaintiffs argue that they are asserting procedural rights based upon "the procedures governing the enactment of statutes set forth in the text of Article I." Pls.' Opp'n at 32 (relying on *INS v. Chadha*, 462 U.S. 919 (1983) and *Clinton v. New York*, 524 U.S. 417 (1998)). According to Plaintiffs, the Presentment Clause, Article I, section 7, is the "only [] procedure [prescribed by the Constitution] for the passage of laws." *Id.* at 1.[4] Plaintiffs further allege that although the Presentment Clause does not create an individual right to have a bill *passed* by the Senate, it does create a procedural right to have the bill fairly considered by the majority in the Senate. *See id.* at 2.

However, Plaintiffs identify no authority for the proposition that an individual has a "procedural right" to any particular form of congressional consideration or debate on a bill. The Supreme Court cases on which Plaintiffs purport to rely do not address procedural standing and thus are not instructive on this issue. For example, in *Chadha*, the Supreme Court held that a provision of the Immigration and Nationality

---

[4] The Presentment Clause, Article I, section 7 states, in relevant part: "Every bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States." Plaintiffs also rely on the Quorum Clause, Article I, section 5, clause 1, which states: "a Majority of each [House] shall constitute a Quorum to do Business."

17

Act that authorized the House of Representatives alone, by
resolution, to invalidate an immigration decision of the
Executive Branch (the "one-House veto") was unconstitutional
because it violated the Presentment Clause. *See* 462 U.S. at
952-58. Similarly, in *Clinton*, the Supreme Court ruled
unconstitutional the Line Item Veto Act, which gave the
President the power to cancel certain types of statutory
spending and tax provisions after they had been signed into law.
*See* 524 U.S. at 448-49. Plaintiffs rely on the Court's analysis
of the merits in both cases. The Court recognized that the
Presentment Clause's requirement that legislative action be
passed by both Houses and then presented to the President
"represents the Framers' decision that the legislative power of
the Federal Government be exercised in accord with a single,
finely wrought and exhaustively considered, procedure." *Chadha*,
462 U.S. at 951; *see also Clinton*, 524 U.S. at 440. Nowhere in
either case, however, did the Court analyze whether or not the
Constitution, and more specifically Article I, confers an
individual procedural right sufficient for standing.

More importantly, however, Plaintiffs' attempt to invoke
procedural standing fails because they are unable to demonstrate
that any alleged procedural right to majority consideration of
proposed legislation is designed to protect Plaintiffs'
particularized, concrete interests. As the D.C. Circuit has

18

recognized, not all procedural-rights violations are sufficient
for standing; a plaintiff must show that "the procedures in
question are *designed* to protect some threatened concrete
interest of *his* that is the ultimate basis of his standing."
*Center for Law and Educ.*, 396 F.3d at 1157 (citing *Lujan*, 504
U.S. at 573 n.8). "[D]eprivation of a procedural right without
some concrete interest that is affected by the deprivation--a
procedural right *in vacuo*--is insufficient to create Article III
standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496
(2009).

Plaintiffs assert that "structural constitutional limits
are designed to 'protect the individual.'" Pls.' Opp'n at 33
(quoting *Bond v. United States*, 131 S. Ct. 2355, 2365 (2011)).
*Bond*, however, does not involve procedural standing and is
distinct from the instant case. In *Bond*, the plaintiff, who had
been convicted of a federal crime, challenged the statute under
which she was convicted as a violation of the Tenth Amendment.
The Court stated that "it [was] clear" Ms. Bond had Article III
standing because she was injured by the statute when she was
convicted of a federal crime; and indeed, the Court's
invalidation of the statute would redress that harm. *See* 131 S.
Ct. at 2361-62. The issue in *Bond* was whether the individual
plaintiff, rather than a State, was the proper party to bring a
Tenth Amendment challenge, a question of prudential standing,

not procedural standing. *See id.* at 2360, 2363-64. The Supreme Court stated:

> An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. . . . The recognition of an injured person's standing to object to a violation of a constitutional principle that allocates power within government is illustrated . . . by cases in which individuals sustain *discrete, justiciable injury* from actions that transgress separation-of-powers limitations.

*Id.* at 2364-65 (emphasis added). *Bond* stands for the proposition that where a plaintiff has already suffered an Article III injury-in-fact due to a statute, that individual can challenge the statute's validity under the Constitution. *See id.* at 2365 ("[I]ndividuals, too, are protected by the operations of separation of powers and checks and balances; and they are not disabled from relying on those principles in *otherwise justiciable cases and controversies*." (emphasis added)). It does not stand for the proposition that the Constitutional principle of separation of powers confers an individual right that is sufficient to meet the more relaxed requirements of procedural standing.[5]

---

[5] The case is also factually distinct because the Court could redress Ms. Bond's injury, whereas here, this Court cannot redress Plaintiffs' deprivation of the opportunity to benefit from legislation that was never enacted, as will be discussed in more detail *infra* Part III.A.2.a.

Beyond their inability to point to a precise procedural right conferred by Article I, Plaintiffs do not point to a concrete interest, particular to these Plaintiffs, that Article I of the Constitution was designed to protect. The Court therefore concludes that Plaintiffs have not demonstrated procedural standing.

### 2.    Article III Standing

As noted above, to demonstrate Article III standing, a plaintiff must establish a concrete and particularized injury, which is fairly traceable to the alleged illegal action, and likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.  Plaintiffs assert that all three groups of Plaintiffs have Article III standing.  Because the DREAM Act Plaintiffs and Common Cause present common issues of law with respect to the standing inquiry, the Court analyzes standing as to these two groups together, and considers the standing of the House Member Plaintiffs separately below.

#### a.    DREAM Act Plaintiffs and Common Cause

Both the DREAM Act Plaintiffs and Common Cause allege that the Cloture Rule injured them by depriving them of the "opportunity to benefit" from the DREAM and DISCLOSE Acts.  *See* Pls.' Opp'n at 46-48, 55-57 (citing, *e.g.*, *N.E. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993); *CC Distribs., Inc. v. United States*, 883 F.2d 146,

150 (D.C. Cir. 1989) ("[A] plaintiff suffers a constitutionally

cognizable injury by the loss of an opportunity to pursue a

benefit . . . even though the plaintiff may not be able to show

that it was certain to receive that benefit had it been accorded

the lost opportunity.")).[6]  Plaintiffs emphasize that they are

not alleging a "substantive right" to either bill, but rather

that their injury arises out of "the Senate's use of

unconstitutional procedures to block a bill that would have

benefitted plaintiffs."  Pls.' Opp'n at 48; *see also id.* at 43-

---

[6] Common Cause asserts that it has organizational standing.
For an organization to have standing in its own right, it must
meet the same requirements of individual standing: injury-in-
fact, causation, and redressability. *See Havens Realty Corp. v.
Coleman*, 455 U.S. 363, 378-79 (1982); *Nat'l Treasury Emps. Union
v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). In the
Complaint, Common Cause also alleged associational standing.
*See* Compl. ¶ 9(D)(1). An association may have standing to sue
on behalf of its members if "(1) at least one of its members
would have standing to sue in his own right, (2) the interests
the association seeks to protect are germane to its purpose, and
(3) neither the claim asserted nor the relief requested requires
that an individual member of the association participate in the
lawsuit." *Sierra Club v. EPA*, 292 F.2d 895, 898 (D.C. Cir.
2002). In their Motion to Dismiss, Defendants argued that
Common Cause did not meet the requirements of associational
standing because it had not specifically identified any of its
members who suffered the requisite harm. *See* Defs.' Mem. at 22-
23. Plaintiffs did not respond to this argument in their
Opposition. The Court therefore finds that Plaintiffs have
conceded that they do not have associational standing. *See
Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.
Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir.
2004) ("It is well understood in this Circuit that when a
plaintiff files an opposition to a dispositive motion and
addresses only certain arguments raised by the defendant, a
court may treat those arguments that the plaintiff failed to
address as conceded." (citation omitted)).

44 ("The use of Rule XXII to illegally block the DISCLOSE Act
during the 111th Congress--in violation of the procedures
governing the enactment of statutes--injured Common Cause as an
organization because Common Cause diverted staff, time, and
resources to combatting the effects of secret expenditures by
Super PACs that would have been prohibited by the DISCLOSE
Act.").

    The Court is not persuaded that Plaintiffs' alleged injury
is akin to a deprivation of a contracting opportunity, as
recognized by *City of Jacksonville* and its progeny.  In those
cases, although the plaintiff did not have to show that it would
have obtained the particular benefit at issue, it still had to
show that its injury was "certainly impending."  *See, e.g.*,
*Adarand Constrs., Inc. v. Pena*, 515 U.S. 200, 211-12 (1995).
Neither the DREAM Act nor the DISCLOSE Act was ever debated by
the Senate, let alone enacted into law.  And Plaintiffs'
assertion that the bills are likely to be re-introduced does not
demonstrate that the bills will ever be enacted by the House and
the Senate and signed by the President.  As a result, there is
no existing or certainly impending opportunity from which
Plaintiffs could benefit, but for the Cloture Rule.  Any injury
is therefore hypothetical, rather than concrete.[7]  As Defendants

---

    [7] *Cf. Clinton*, 524 U.S. at 432 ("[Plaintiffs] suffered an
immediate injury when the President canceled the limited tax

23

argue, to recognize such an injury as sufficient for Article III standing would potentially permit standing for any individual who would have benefitted from any piece of legislation that passed one House of Congress but not the other.[8]

Even were the Court persuaded that this was sufficient to demonstrate an injury-in-fact, however, neither the DREAM Act Plaintiffs nor Common Cause can show causation or redressability

---

benefit that Congress had enacted to facilitate the acquisition of processing plants. . . . Congress enacted § 968 for the specific purpose of providing a benefit to a defined category of potential purchasers of a defined category of assets. The members of that statutorily defined class received the equivalent of a statutory 'bargaining chip' to use in carrying out the congressional plan to facilitate their purchase of such assets. . . . [Plaintiffs] had concrete plans to utilize the benefits of § 968 . . . By depriving them of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents.").

[8] Common Cause also has not demonstrated a sufficient injury to its organizational mission. An organization seeking to establish *Havens* standing must show a "direct conflict between the defendant's conduct and the organization's mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430; *see also ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). According to Plaintiffs, the DISCLOSE Act's defeat "undoubtedly set back Common Cause's mission of encouraging transparency in elections. . . . Common Cause must now independently investigate each individual Super PAC to learn what the DISCLOSE Act would have automatically required." Pls.' Opp'n at 55-56. However, Common Cause has shown no direct conflict between the allegedly illegal conduct -- use of the Cloture Rule -- and the organization's mission -- encouraging transparency in elections. Rather, the use of the Cloture Rule is but an intermediate step that prevented a benefit to the organization's activities. Plaintiffs cite no authority that supports such an attenuated injury as sufficient for purposes of organizational standing.

for similar reasons. As another Judge on this Court stated with respect to an earlier challenge to the Cloture Rule:

> There is no guarantee that, but for the cloture rule, the legislation favored by [plaintiff] would have passed the Senate; that similar legislation would have been enacted by the House of Representatives; and that the President would have signed into law the version passed by the Senate. There are too many independent actors and events in the span between a cloture vote and the failure to pass legislation to characterize the connection as direct.

*Page v. Shelby*, 995 F. Supp. 23, 29 (D.D.C. 1998), *aff'd without op.*, 172 F.3d 920 (D.C. Cir. 1998). Not only have Plaintiffs failed to demonstrate that the DREAM and DISCLOSE Acts would have *passed* but for the Cloture Rule,[9] but they also have not

---

[9] Plaintiffs allege that at this stage, the Court must accept as true Plaintiffs' claim that the DREAM and DISCLOSE Acts *would have passed* the Senate but for the Cloture Rule. *See* Compl. ¶ 9(D)(1)(b) ("The DISCLOSE Act . . . had the support of 59 senators and the President . . . ."); *id.* ¶ 9(D)(2)(a)-(b); *id.* ¶ 9(E)(1) ("[T]he DREAM Act had the support of a clear majority of 55 senators and the support of the President."). However, this was the number of votes in favor of cloture, not in favor of the ultimate passage of the bills. *See* Compl. at 6 n.3 ("Both bills . . . were supported by . . . a majority of senators (as evidenced by the fact that both bills received 59 and 55 votes, respectively, in the Senate on motions for cloture)[.]"). A vote in favor of cloture is not necessarily a guarantee of ultimate support for a bill. *See, e.g.*, Defs.' Mem. at 36 n.29 (providing examples of instances in which senators voted for cloture and then did not vote on the bills' passage and vice versa). Although the Court accepts as true Plaintiffs' factual allegations about the number of Senators who supported cloture, the allegation that the bills would have passed the Senate is the type of conclusory allegation that the Court need not accept, even at the motion-to-dismiss stage. *Cartwright Int'l Van Lines*, 525 F. Supp. 2d at 193 ("In evaluating a motion to dismiss for lack of subject-matter jurisdiction, the court must accept the complaint's well-pled factual allegations as true and construe all reasonable

25

persuaded the Court that they necessarily would have benefitted from those Acts. For example, although Plaintiffs allege that each of the DREAM Act Plaintiffs met the requirements of the DREAM Act considered by the previous Congress, *see* Compl. ¶ 9(C)(1), Defendants argue that the ultimate determination would have been at the discretion of the Secretary of Homeland Security, *see* Defs.' Mem. at 29 (citing H.R. 5281, 111th Cong. § 6(a)(1) (2010) ("Secretary of Homeland Security *may* cancel removal of an alien . . .")). The connection between the Senate's debate over proposed legislation, or lack thereof, and Plaintiffs' inability to benefit from the opportunities that legislation would have offered is simply too tenuous to support standing.

Finally, even if the Court could declare unconstitutional and sever the sixty vote requirement from the Cloture Rule, that relief would not redress Plaintiffs' alleged injuries because it would not provide them with the opportunity to benefit from the DREAM Act or the DISCLOSE Act.[10] Plaintiffs argue that because

---

inferences in the plaintiff's favor. The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." (internal quotation marks and citation omitted)).

[10] Nor would declaring Rule V unconstitutional redress Plaintiffs' injuries. Not only would this remedy not provide any guarantee with respect to the DREAM and DISCLOSE Acts, which died in the last Congress, but it also would not necessarily ensure that the Senate would change Rule XXII to provide for

26

they have articulated a procedural right, removing a procedural barrier will redress that violation. *See* Pls.' Opp'n at 61-62. However, as discussed *supra* Part III.A.1., Plaintiffs cannot demonstrate that they have a procedural right to majority consideration of legislation, and their attempt to recast the relief they seek as the ability to have debate on bills is nothing more than a generalized grievance. Plaintiffs further contend that it is likely that severing the sixty vote requirement from the Cloture Rule will allow the passage of both bills: "Since the 111th Congress, multiple DREAM Act bills have been reintroduced. . . . Likewise, the DISCLOSE Act has been reintroduced." Pls.' Opp'n at 62 (citations omitted). The Court is not in a position, however, to determine or predict what action the Senate would take in a final vote on either proposed bill, much less what action would be taken by the House of Representatives and the President. Fundamentally, Plaintiffs' inability to demonstrate all three of the requisite Article III standing elements is based upon the same fatal flaw: they cannot show that the invalidation of the Cloture Rule has any connection to, or will have any connection to, their ability to benefit from a particular piece of legislation. The Court

---

majority cloture. This relief is therefore even more speculative than a declaratory judgment with respect to Rule XXII.

concludes, therefore, that it is merely speculative that

Plaintiffs' alleged injury would be redressed by a favorable

decision.[11]

### b. House Member Plaintiffs

Plaintiffs assert that the House Members have been injured

because the Cloture Rule nullified votes they personally cast in

favor of the DREAM Act and the DISCLOSE Act. *See* Pls.' Opp'n at

49.[12] Defendants contend that standing based on this claim of

---

[11] Plaintiffs also assert that the Cloture Rule impacted the
DREAM Act Plaintiffs' concrete interests in avoiding deportation
and obtaining a path to citizenship. *See* Pls.' Opp'n at 44.
Although the Court does not seek to diminish the seriousness of
that injury, it cannot find such an allegation sufficient for
standing here because Plaintiffs cannot show that the Cloture
Rule was the cause of that harm. That is, the DREAM Act
Plaintiffs are not being denied a path to citizenship *because of*
the Cloture Rule; rather, their injury pre-dates the Senate's
consideration of that Act and is the result of existing
immigration law. Nor can the DREAM Act Plaintiffs demonstrate
that this Court's invalidation of the Cloture Rule's
supermajority requirement would redress that harm -- no
prospective action by this Court can revive the DREAM Act, and
it is speculative whether the House, Senate and President will
agree to enact the same legislation in the future.

[12] The House Member Plaintiffs additionally claim they have
suffered an informational injury because the failure of the
DISCLOSE Act to pass prevented the House Members from being able
to access critical information about the identities of parties
financing negative ads in those House Members' campaigns. *See*
Pls.' Opp'n at 54-55. However, an informational injury suffices
for standing purposes only when the complaining party "fails to
obtain information which must be publicly disclosed pursuant to
a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see also
Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008) (holding that a
Member of Congress had standing in his capacity as a candidate
for office to challenge an FEC rule that allegedly denied him
information that a statute, the Bipartisan Campaign Reform Act

28

injury is precluded by the Supreme Court's ruling in *Raines*, 521 U.S. 811. *See* Defs.' Mem. at 24. The Court is not persuaded that the House Members' alleged injury constitutes vote nullification for two independent reasons: (1) this case is factually distinguishable from the "narrow" exception recognized by the Supreme Court, and (2) it arises in the federal context, which raises fatal separation-of-powers concerns.

In *Raines*, four Senators and two Representatives who had voted against the Line Item Veto Act brought suit challenging the Act's constitutionality. The Act gave the President authority to "cancel" certain spending and tax benefit measures after they had been enacted into law. *See* 521 U.S. at 814-15. The plaintiffs claimed that the Act injured them in their official capacities by "(a) alter[ing] the legal and practical effect of all votes they may cast on bills" subject to the line item veto, "(b) divest[ing] [them] of their constitutional role in the repeal of legislation," and "(c) alter[ing] the constitutional balance of powers between the Legislative and Executive Branches." *Id.* at 816. The Supreme Court rejected these bases for standing, finding that the plaintiffs lacked

of 2002, required be disclosed). Here, by contrast, the House Member Plaintiffs do not identify a statute that entitles them to information about the identities of donors to Super PACs. Instead, they challenge the fact that the particular statute that would have provided that entitlement was never enacted. Therefore, Plaintiffs do not assert a sufficient informational injury for purposes of standing.

"concrete injury" because their asserted harm was "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally. . . . [plaintiffs'] claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete." *Id.* at 821. Accordingly, the Court concluded that because the Congress members' alleged injury was "wholly abstract and widely dispersed," and not personal to them as individuals, they did not allege a sufficient injury in fact to establish Article III standing. *Id.* at 829-30. The Court recognized two explicit exceptions, however: (1) when the Members have been individually deprived of something they are personally entitled to, as in *Powell v. McCormack*, 395 U.S. 486 (1969), *see Raines*, 521 U.S. at 821-22, or (2) when the Members' votes would have been sufficient to defeat (or enact) a bill which has gone into effect (or not been given effect) and "their votes have been completely nullified," as in *Coleman v. Miller*, 307 U.S. 433 (1939), *see Raines*, 521 U.S. at 823.

Plaintiffs first argue that their injury is like that in *Powell* because the House Member Plaintiffs "personally cast votes in favor of the DREAM and DISCLOSE Acts" which the Senate's Filibuster Rule then nullified, and therefore they "do not raise a claim shared by every member of Congress, only those

30

who voted for the DREAM and DISCLOSE Acts[.]"  Pls.' Opp'n at

50.  Plaintiffs thus assert that they "have been deprived of

something to which they personally are entitled."  *Id.* (citation

omitted).  The Court is not persuaded by this argument.  In

*Powell*, Representative Powell was denied payment of his salary -

- a personal entitlement -- when he was excluded from his House

seat.  *See* 395 U.S. at 493.  In contrast, the House Member

Plaintiffs' votes are powers they exercise in their official

capacities as House Members.  Just like in *Raines*, those votes

are not a personal entitlement.  *See Raines*, 521 U.S. at 821

("Unlike the injury claimed by Congressman Adam Clayton Powell,

the injury claimed by the Members of Congress here is not

claimed in any private capacity but solely because they are

Members of Congress.").

Plaintiffs next analogize their injury to that in *Coleman*.

There, twenty of Kansas' forty state senators voted not to

ratify the proposed Child Labor Amendment to the Federal

Constitution.  The vote deadlocked, such that the amendment

ordinarily would not have been ratified; however, the Lieutenant

Governor, the presiding officer of the State Senate, cast a

deciding vote in favor of the amendment, and it was deemed

ratified.  The twenty state senators who had voted against the

amendment filed suit seeking a writ of mandamus to compel state

officials to recognize that the legislature had not, in fact,

31

ratified the amendment.  *See* 307 U.S. at 436-37.  The Supreme

Court held that the senators had standing because their "votes

against ratification have been overridden and virtually held for

naught although . . . their votes would have been sufficient to

defeat ratification.  . . . [T]hese senators have a plain,

direct and adequate interest in maintaining the effectiveness of

their votes."  *Id.* at 438.

As the Supreme Court recognized in *Raines*, "our holding in

*Coleman* stands . . . for the proposition that legislators whose

votes would have been sufficient to defeat (or enact) a specific

legislative act have standing to sue if that legislative action

goes into effect (or does not go into effect), on the ground

that their votes have been completely nullified."  521 U.S. at

823.  The Court in *Raines* distinguished the congressmen's injury

there, stating "[t]hey have not alleged that they voted for a

specific bill, that there were sufficient votes to pass the

bill, and that the bill was nonetheless deemed defeated."  *Id.*

at 824.  Here, by contrast, Plaintiffs argue that the House

Member Plaintiffs "voted for two specific bills, that there were

sufficient votes to pass each bill, and that each bill should

have been enacted, but was nonetheless deemed defeated because

of the Senate's illegal application of Rule XXII."  Pls.' Opp'n

at 52.

The Court acknowledges that this case appears to present a unique question on vote nullification after *Raines*. None of the D.C. Circuit's post-*Raines* opinions have addressed the scenario where members of one House of Congress sued the other. *See, e.g.*, *Campbell v. Clinton*, 203 F.3d 19, 22-23 (D.C. Cir. 2000) (holding that thirty-one congressmen did not have standing based on a vote nullification theory to challenge the President's use of force in Yugoslavia without seeking congressional approval); *Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999) (finding that four congressmen did not have standing to challenge the President's use of executive order to enact a new environmental program, and stating "[i]f, as the Court held in *Raines*, a statute that allegedly 'divests [congressmen] of their constitutional role' in the legislative process does not give standing to sue, then neither does an Executive Order that allegedly deprives congressmen of their 'right[] to participate and vote on legislation in a manner defined by the Constitution'" (citation omitted)). Indeed, the Court is not aware of any case in this Circuit where a court has recognized legislative standing after *Raines*. The Court is not persuaded that Plaintiffs' alleged nullification injury is sufficient to confer standing in this case either.

The D.C. Circuit has interpreted the *Coleman* exception to mean "treating a vote that did not pass as if it had, or vice

versa." *Campbell*, 203 F.3d at 22. As Defendants argue, the House Member Plaintiffs' votes in favor of the DREAM and DISCLOSE Acts were never treated as if they did not pass. Rather, the bills were treated as if they passed the House, but the Senate then failed to debate or pass them itself. *See* Defs.' Reply Mem. of P. & A. in Supp. of Mot. to Dismiss at 8-9. By contrast, in *Coleman*, state officials endorsed a defeated ratification, treating it as if it had been approved. A closer example of vote nullification, then, is the theoretical scenario presented in *Raines*, where appropriations bills could have passed both the House and Senate, been signed by the President, but then were subject to line-by-line "cancellation" by the President, effectively deleting what was voted on -- and passed -- by the House and Senate. The Court found that this potential scenario did not "nullify [plaintiffs'] votes in the future in the same way that the votes of the *Coleman* legislators had been nullified." *Raines*, 521 U.S. at 824.

> In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the [Line Item Veto] Act has no effect on this process. In addition, a majority of Senators and Congressmen can vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process. *Coleman* thus provides little meaningful precedent for [plaintiffs'] argument.

*Id.* Here too, Plaintiffs have failed to demonstrate that their votes to pass the DREAM and DISCLOSE Acts were nullified in the

34

same manner as in *Coleman*. Furthermore, the D.C. Circuit has emphasized that the *Coleman* exception is a "narrow rule." *Chenoweth*, 181 F.3d at 116; *see also Campbell*, 203 F.3d at 24 & n.6. Interpreting the exception in the way Plaintiffs urge, however, would transform it from a narrow exception into a broader one, potentially allowing members of either House of Congress to sue the other for failure to pass a bill the other House supported. Therefore, the Court is not persuaded that the House Members' alleged injury here presents "complete nullification" of the kind recognized by the Supreme Court in *Coleman*.[13]

Finally, the Court has considered whether separation-of-powers concerns counsel against finding legislative standing here. In *Raines*, the Supreme Court noted without deciding that *Coleman* might also be distinguishable from "a similar suit brought by federal legislators, since the separation-of-powers concerns present in such a suit were not present in *Coleman*." 521 U.S. at 824 n.8; *see also Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977) ("The major distinguishing factor between *Coleman* and the present case lies in the fact that the

---

[13] The Court is also not persuaded that the lack of a legislative remedy transforms the injury here into the narrow vote nullification exception. While the House Member Plaintiffs themselves do not have a remedy, the Senate does have a remedy of its own -- amendment of its rules. Because the other considerations weigh against finding legislative standing here, the Court declines to find this factor dispositive.

35

plaintiffs in *Coleman* were state legislators. A separation of

powers issue arises as soon as the *Coleman* holding is extended

to United States legislators. If a federal court decides a case

brought by a United States legislator, it risks interfering with

the proper affairs of a coequal branch."). The law of Article

III standing "is built on a single basic idea -- the idea of

separation of powers." *Allen*, 468 U.S. at 752. Here, and as

discussed in more detail *infra*, separation-of-powers concerns

persuade the Court that this suit is not justiciable.

## B. Political Question Doctrine

Like standing, the political question doctrine stems from

the case-or-controversy requirement of Article III. The courts

lack jurisdiction over "political questions that are by their

nature 'committed to the political branches to the exclusion of

the judiciary.'" *Schneider*, 412 F.3d at 193 (citation omitted);

*see also Marbury v. Madison*, 5 U.S. 137, 170 (1803). A court

may not, however, refuse to adjudicate a dispute merely because

a decision "may have significant political overtones." *Japan

Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986);

*see also Chadha*, 462 U.S. at 943 ("Resolution of litigation

challenging the constitutional authority of one of the three

branches cannot be evaded by courts because the issues have

political implications[.]"). "The nonjusticiability of a

political question is primarily a function of the separation of

powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). In *Baker*,
the Supreme Court identified six circumstances in which an issue
might present a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of
> the issue to a coordinate political department; or [2] a
> lack of judicially discoverable and manageable standards
> for resolving it; or [3] the impossibility of deciding
> without an initial policy determination of a kind clearly
> for nonjudicial discretion; or [4] the impossibility of a
> court's undertaking independent resolution without
> expressing lack of the respect due coordinate branches of
> government; or [5] an unusual need for unquestioning
> adherence to a political decision already made; or [6] the
> potentiality of embarrassment from multifarious
> pronouncements by various departments on one question.

*Id.* at 217. The presence of any one factor indicates that the
case presents a non-justiciable political question. *See
Schneider*, 412 F.3d at 194. Defendants argue that three of the
six *Baker* factors apply in this case: (1) Plaintiffs' claims
involve a matter textually committed by the Constitution to the
Senate; (2) there is a lack of judicially discoverable and
manageable standards for resolving Plaintiffs' claims; and (3)
resolution of Plaintiffs' claims would require the Court to
intrude into the Senate's internal proceedings, thereby
expressing a lack of respect due a coordinate branch. The Court
addresses each in turn.

### 1. Textual Constitutional Commitment of Rulemaking Power to the Senate

The Supreme Court has long recognized that the power
committed in Article I, section 5 provides each House with broad

discretion to determine the rules of its proceedings. *See United States v. Ballin*, 144 U.S. 1, 5 (1892). The parties dispute the applicability of two Supreme Court precedents here: *Powell v. McCormack*, 395 U.S. 486, and *Nixon v. United States*, 506 U.S. 224 (1993).

Plaintiffs assert that this case is more like *Powell*, in which the Supreme Court found justiciable a challenge to the House's power to judge the qualifications of its Members. There, the Court held that Representative Powell's challenge to his exclusion from the House was justiciable because the Court determined that the House's power to "be the Judge of the . . . Qualifications of its own Members," U.S. Const. art. I, § 5, cl. 1, was expressly limited by Article I, section 2, clause 2, which sets forth the three textual criteria for membership (age, residency, and citizenship). *See Powell*, 395 U.S. at 547-50. Defendants assert, by contrast, that this case is more like *Nixon*. There, a federal judge was convicted by the Senate on impeachment charges and removed from office. The judge filed suit challenging his conviction and alleging that Senate Rule XI (governing impeachment trials) was unconstitutional because it permitted the Senate to appoint a committee to receive evidence and take testimony in the impeachment trial. Judge Nixon argued that the constitutional grant to the Senate of the power to "try" impeachments, U.S. Const. art. I, § 3, cl. 6, required the

38

full Senate, not merely a committee, to hold evidentiary

proceedings. *See* 506 U.S. at 228. The Supreme Court held that

the case was non-justiciable because the power to try

impeachments was textually committed to the Senate. *See id.* at

229-34. The Court stated:

> Our conclusion in *Powell* was based on the fixed meaning of
> "qualifications" set forth in Art. I, § 2. The claim by
> the House that its power to "be the Judge of the Elections,
> Returns and Qualifications of its own Members" was a
> textual commitment of unreviewable authority was defeated
> by the existence of this separate provision specifying the
> only qualifications which may be imposed for House
> membership. The decision as to whether a member satisfied
> these qualifications was placed with the House, but the
> decision as to what these qualifications consisted of was
> not. In the case before us, there is no separate provision
> of the Constitution which could be defeated by allowing the
> Senate final authority to determine the meaning of the word
> "try" in the Impeachment Trial Clause.

*Id.* at 237; *see also Michel v. Anderson*, 14 F.3d 623, 626-27

(D.C. Cir. 1994) (concluding that Article I, section 2's

requirement that the House of Representatives "be composed of

Members chosen every second Year by the People of the several

States" provided an express textual limit on the rulemaking

power and thus rendered justiciable a challenge to the House's

rule permitting non-member delegates to vote in the Committee of

the Whole). Therefore, in order to present a justiciable

challenge to congressional procedural rules, Plaintiffs must

identify a separate provision of the Constitution that limits

the rulemaking power. The Court finds that this case is more

like *Nixon* because Plaintiffs cannot identify any constitutional provision that expressly limits the authority committed to the Senate by Article I, section 5, clause 2.

Plaintiffs allege that the Quorum Clause, U.S. Const. art. I, § 5, cl. 1, the Presentment Clause, U.S. Const. art. I, § 7, cl. 2, and the existence of other constitutional provisions expressly providing for "supermajority votes" on certain matters provide explicit textual limits on the Senate's rulemaking power. This is simply not the case. None of these provisions contains any language that expressly limits the Senate's power to determine its rules, including when and how debate is brought to a close. More fundamentally, Plaintiffs have not demonstrated that the Presentment Clause, the Quorum Clause, or any other constitutional provision explicitly requires that a simple majority is all that is required to close debate and enact legislation. As is made clear in the Complaint, Plaintiffs' argument is that the Cloture Rule "conflicts" with these constitutional provisions, *see* Compl. ¶ 60, but Plaintiffs do not assert -- nor can they -- that any of these provisions expressly limits the Senate's power to determine the rules of its proceedings.[14]

---

[14] Plaintiffs attempt to compare the Senate's rulemaking power to the congressional power to make laws, arguing that "[i]t cannot be that statutes adopted by both Houses of Congress are subject to judicial review while a mere internal rule

Plaintiffs contend that the Senate's rulemaking authority

has been limited by *United States v. Smith*, 286 U.S. 6 (1932)

and *Ballin*, 144 U.S. at 5, which stated that "[while] the

constitution empowers each house to determine its rules of

proceedings, [i]t may not by its rules ignore constitutional

restraints or violate fundamental rights." *See* Pls.' Opp'n at

22 (quoting *Ballin*, 144 U.S. at 5). According to Plaintiffs,

the Supreme Court has followed *Ballin* and *Smith* in subsequent

cases in which the Court "rejected interpretations by

congressional committees of their own rules." *Id.* at 23 (citing

*Chadha*, 462 U.S. at 941; *Yellin v. United States*, 374 U.S. 109,

114 (1963) ("It has long been settled . . . that rules of

Congress are judicially cognizable"); *Christoffel v. United

States*, 338 U.S. 84 (1949); *Vander Jagt v. O'Neill*, 699 F.2d

1166, 1170, 1173 (D.C. Cir. 1982)). As Defendants assert,

however, these cases are all either distinguishable or

contradict Plaintiffs' arguments. Indeed, in none of these

cases did courts reject Congress's own rules as

---

adopted by only one House of Congress, without the consent of
the other House or the President, is exempt from judicial
scrutiny." *See* Pls.' Opp'n at 25-26. As the Supreme Court
recognized in *Nixon*, it has long been recognized that judicial
review was available and appropriate as a check on the
Legislature's power with respect to statutes. *See* 506 U.S. at
233 (citing THE FEDERALIST, NO. 78, at 524 (J. Cooke ed. 1961)).
This argument has no bearing on the Senate's power to determine
the rules of its own proceedings.

41

unconstitutional.[15]  Rather, the courts either rejected

Congress's actions for being in violation of its own rules,[16] or,

---

[15] In *Ballin*, the plaintiff claimed that the House's passage of a statute was invalid for lack of a quorum and, in that regard, that the House rule for determining a quorum was unconstitutional.  *See* 144 U.S. at 4-5.  The Court stated:

> The Constitution empowers each house to determine its rules of proceedings.  It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained.  But within these limitations *all matters of method are open to the determination of the house*, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just. . . . The power to make rules . . . is a continuous power, always subject to be exercised by the house, and within the limitations suggested, absolute and beyond the challenge of any other body or tribunal.

*Id.* at 5 (emphasis added).  The Court found that, as to the question of determining a quorum, there was "no constitutional method prescribed, [] no constitutional inhibition of any of [the possible methods of determining a quorum], and no violation of fundamental rights" by the House's rule.  *Id.* at 6.  Accordingly, the Court did not review the rule's validity.  *See id.* ("The Constitution has prescribed no method of making this determination, and it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact.").

[16] *See Yellin*, 374 U.S. at 121-24 (holding that House committee violated its own rules by failing to consider the plaintiff's request to be interrogated in a private, executive session, rather than in public); *Christoffel*, 338 U.S. at 88-89 ("Congressional practice in the transaction of ordinary legislative business is of course none of our concern . . . . The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what [rules] the House has established and whether they have been followed."); *Smith*, 286 U.S. at 33 ("The question

42

as in *Chadha*, the Court rejected a statutory provision for violating the explicit text of the Constitution.[17]  As noted above, Plaintiffs identify no explicit constitutional restraints upon the Senate's Cloture Rule, nor do they point to fundamental rights which have been violated.  It is precisely for this reason that the Court finds that this challenge presents a political question.

### 2.    Lack of Judicially Discoverable and Manageable Standards

The Court is also persuaded that this case presents a political question because no judicially manageable standards exist against which to review the Senate's rules governing debate.

Plaintiffs argue that they merely seek a declaratory judgment, the exact same relief that the Court granted in *Powell*.  "Just as in *Powell*, the plaintiffs seek a declaration 'determin[ing] that the [Senate] was without power' to condition

_____

primarily at issue relates to the construction of the applicable rules, not to their constitutionality.").

[17] *See* 462 U.S. at 942.  Moreover, in *Vander Jagt*, fourteen Republican Members of the House sued the Democratic House leadership and the Democratic Caucus, alleging that the Democrats had systematically discriminated against them by providing them with fewer seats on House committees and subcommittees than they were proportionally owed, thereby diluting their influence.  *See* 699 F.2d at 1167.  The D.C. Circuit affirmed the district court's dismissal of the case, stating that it was exercising its "remedial discretion" to withhold relief "given [its] respect for a coequal branch of government."  *Id.* at 1176.

43

Senate action on the vote of a supermajority rather than a simple majority. Such a declaration 'requires an interpretation of the Constitution--a determination for which clearly there are judicially []manageable standards.'" Pls.' Opp'n at 29-30 (quoting *Powell*, 395 U.S. at 549). But *Powell* involved the interpretation of two seemingly contradictory constitutional provisions: Article I, section 5, clause 1, which set forth the House's power to "be the Judge of the . . . Qualifications of its own Members," and Article I, section 2, clause 2, which provided three explicit criteria for membership (age, residency, and citizenship). The Court reviewed the legislative history of Article I, section 5 and determined that the House's power to "judge" the qualifications of its own members was limited to the qualifications expressly set forth in the Constitution. *See* 395 U.S. at 521-48; *see also id.* at 522 ("Our examination of the relevant historical materials leads us to the conclusion that . . . the Constitution leaves the House without authority to exclude any person, duly elected by his constituents, who meets all the requirements for membership expressly prescribed in the Constitution."). Here, Plaintiffs point to no standard within the Constitution by which the Court could judge whether or not the Cloture Rule is constitutionally valid.[18]

---

[18] Plaintiffs additionally argue that Defendants "advance no argument as to why Rule XXII is any less justiciable than the

44

### 3. Intrusion into the Senate's Internal Proceedings

Finally, the Court finds that reaching the merits of this case would require an invasion into internal Senate processes at the heart of the Senate's constitutional prerogatives as a House of Congress, and would thus express a lack of respect for the Senate as a coordinate branch of government.

Plaintiffs argue that judicial review of the Cloture Rule would not reflect lack of respect for the Senate; instead, it reflects respect for the Constitution. Pls.' Opp'n at 30. According to Plaintiffs, the "federal courts show no disrespect for other branches of government when they perform their constitutionally assigned duties to review and rule upon the constitutionality of acts of the President . . . , or the joint acts of Congress and the President . . . , or of only one House of the legislative branch . . . . Such determinations fall within the traditional role accorded courts to interpret the law

_____

one-House veto in *Chadha*. . . . Nor has it explained why ruling on Rule XXII would be any less appropriate than the Court's treatment of a Senate rule in *Smith*." Pls.' Opp'n at 30 (citing *Chadha*, 462 U.S. at 942; *Smith*, 286 U.S. at 33). But *Chadha* and *Smith* are also distinguishable. As noted above, *Chadha* involved a challenge to the constitutionality of a statute, not an internal Senate rule. Moreover, the dispute in *Chadha* was whether the one-House veto conflicted with the Presentment Clause, which provided a clear judicially manageable standard for the Court to use in reviewing the one-House veto. In *Smith*, as noted above, the issue was "the construction of the applicable rules, not [] their constitutionality." 286 U.S. at 33. The Court did not say anything about judicially manageable standards which it would use to review the constitutionality of an internal congressional rule.

and do not involve a 'lack of the respect due [a] coordinate [branch] of government.'" *Id.* (citations omitted). Plaintiffs provide no authority, however, for the proposition that the Court's review of an internal rule of Congress, rather than a legislative act, would reflect respect for the Constitution and not a lack of respect for the Senate, particularly where, as here, Plaintiffs have identified no constitutional restraint on the Senate's power to make rules regulating debate. In *Judicial Watch, Inc. v. United States Senate*, although the D.C. Circuit did not explicitly reach the political question doctrine, the court noted:

> While [plaintiff] may have asked for such a judicial rewrite [to require a simple majority rule for cloture on judicial nominations], our providing one would obviously raise the most acute problems, given the Senate's independence in determining the rules of its proceedings and the novelty of judicial interference with such rules.

432 F.3d 359, 361 (D.C. Cir. 2005). This Court agrees.

Accordingly, the Court finds that, absent a clear constitutional restraint, under the separation of powers recognized by Article III, it is for the Senate, and not this Court, to determine the rules governing debate.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs lack standing. The Court further concludes that this

46

case presents a non-justiciable political question.[19]

Accordingly, the Court will **GRANT** Defendants' Motion to Dismiss and will **DISMISS** the Complaint.  A separate Order accompanies this Memorandum Opinion.

**SIGNED:**    **Emmet G. Sullivan**
            **United States District Judge**
            **December 21, 2012**

---

[19] In view of the resolution of the motion on standing and political question grounds, the Court does not reach Defendants' argument that the Speech or Debate Clause bars this suit.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
                              )
COMMON CAUSE, et al.,         )
                              )
            Plaintiffs,       )
                              ) Civil Action No. 12-775 (EGS)
       v.                     )
                              )
JOSEPH R. BIDEN, JR.,         )
in his official capacity as   )
President of the United States)
Senate, et al.,               )
                              )
            Defendants.       )
                              )
```

**ORDER**

For the reasons stated in the accompanying Memorandum

Opinion filed this same day, it is hereby

**ORDERED** that Defendants' Motion to Dismiss pursuant to Rule

12(b)(1) of the Federal Rules of Civil Procedure is **GRANTED**; and

it is

**FURTHER ORDERED** that Plaintiffs' Complaint is **DISMISSED.**

**SO ORDERED.**

**SIGNED:    Emmet G. Sullivan
             United States District Judge
             December 21, 2012**